2009 OK 22

**Suzanne RUSSELL, not individually, but as Guardian of Donald R. Russell, an incapacitated person, Plaintiff,**

v.

**CHASE INVESTMENT SERVICES CORP., a Delaware corporation, Defendant.**

**No. 106,515.**

Supreme Court of Oklahoma.

April 7, 2009.

Lawrence A.G. Johnson, Tulsa, OK, for the Plaintiff.

James E. Weger, Tadd J.P. Bogan, Jones, Gotcher & Bogan, Tulsa, OK, for the Defendant.

TAYLOR, V.C.J.

¶ 1 The United States District Court for the Northern District of Oklahoma, pursuant to the Revised Uniform Certification of Questions of Law Act, 20 O.S.2001, §§ 1601–1606, certified the question:

> Does the appointment of a general guardian withdraw all of the assets from the estate of a ward subject to a durable power of attorney, such that the person holding power of attorney is without authority to control the ward's assets?

We answer that the appointment of a general guardian of the property[1] does not automatically withdraw all of a ward's assets such that an attorney-in-fact is without power to act on a ward's behalf pursuant to a durable power of attorney.[2]

---

1. Title 30, section 1–109 of the 2001 Oklahoma Statutes defines a general guardian as "a guardian of the person or of all the property of the ward within this state or of both such person and property."

2. The record lacks specific dates, and, thus, it is unclear whether the 1991 or the 2001 Oklahoma Statutes apply here. The language of the statutes cited in this opinion is unchanged from 1991 to 2001 unless specifically noted. Therefore unless otherwise indicated, citations and references to

## I. FACTS

¶ 2 The following facts are presented in the order certifying the question or in the record as certified to this Court. On April 7, 1999, Donald R. Russell (the ward) executed a durable power of attorney (DPA) naming Brenda Kennemer (Kennemer), his daughter, as his attorney-in-fact to "become effective upon [his] disability or incapacity." The ward's DPA gave Kennemer broad power over the ward's person and his property, including (1) the power to "sell, convey, lease, exchange, mortgage, pledge, release, hypothecate or otherwise deal with, dispose of, exchange, or encumber any of my property, either real or personal," (2) the power to "withdraw funds from and draw and sign checks in my name upon any bank or trust company, savings institution, or money-market fund in which I may have funds on deposit or in any new account opened in my name," (3) "the power to hold, invest, reinvest and otherwise deal with and manage all property in which I have any interest," and (4) "the power to transfer or surrender any securities which I may own." The ward's DPA provided that it "shall be valid and binding upon me until revoked or terminated."

¶ 3 In June of 1999, the ward arranged for the defendant, Chase Investment Services Corporation (Chase), to act as custodian of his Individual Retirement Account and to make $1,000.00 monthly distributions to him from the account. In April of 2000, the ward suffered a stroke, and Kennemer and the ward's wife, Suzanne Russell (Russell), agreed that the ward became incapacitated on or about April 23, 2000.[3]

¶ 4 On February 26, 2001, the Oklahoma District Court for Wagoner County issued an

---

the 2001 Oklahoma Statutes include the parallel citations to the 1991 Oklahoma Statutes.

3. The ward's DPA allowed for a presumption of disability or incapacity to arise based on a notarized statement by either the ward's regular physician or two other doctors in lieu of a judicial determination. There is no evidence in the record presented to this Court that this provision was ever utilized.

order finding the ward to be incapacitated and naming Kennemer and Russell as co-guardians.[4] On March 15, 2001, Kennemer and Russell jointly filed an inventory of the ward's property.

¶ 5 The record contains an amended plan for the ward's care and treatment. It provides that the ward shall remain in his home, that "Kennemer will be retained on a full time monthly basis to care for the Ward," that Kennemer "will be paid $1,500.00 a month," and that "[t]he Arkansas Valley CD will be cashed and used to provide the necessary funds to pay Brenda Kennemer." The record does Not contain a plan for management of the ward's financial resources.[5] Neither Kennemer nor Russell filed yearly accountings from 2001 through 2005. On July 31, 2006, Russell filed a yearly accounting for August 8, 2005, through July 18, 2006.

■ ¶ 6 According to Russell's deposition, soon after being named guardians, she and Kennemer presented Chase with the ward's DPA and the guardianship letters.[6] Russell alleges that between 2002 and 2005, Chase, at Kennemer's request and based on the ward's DPA, made approximately $99,000.00 in distributions from the ward's IRA. Russell contends that she confronted Kennemer and that Kennemer then committed suicide.

¶ 7 Russell sued Chase[7] in the Tulsa County District Court for the State of Oklahoma. The petition alleges that the defendant, as a fiduciary, allowed Kennemer to withdraw the ward's IRA assets with no proof of her authority to do so. The case was removed to the United States District Court for the Northern District of Oklahoma. On April 27, 2007, Russell filed a motion asking the federal district court to formulate and certify a question of state law to this Court. Chase initially opposed the motion. At the pretrial hearing held on October 14, 2008, the parties agreed to the question's certification. On October 28, 2008, the Honorable Gregory K. Frizzell issued an order certifying the question to this Court.

■ ¶ 8 In addressing certified questions, this Court's power is limited to answering questions of law. 20 O.S.2001, § 1602. Thus, this Court does not function as a fact finder when answering questions certified pursuant to title 20, sections 1601 through 1606. Russell alleged that Kennemer misappropriated the money disbursed by Chase pursuant to the ward's DPA. We note that the federal district court's statement of facts and the record presented to this Court are incomplete for a determination of this alleged fact. There is nothing in the statement of facts or the record supporting Russell's allegation that Kennemer misappropriated the money allegedly improperly disbursed by Chase. No fact question can be resolved by this Court when answering a certified question of law. There are other allegations, such as whether Russell had access to the

---

**4.** Title 58, section 1074(B) of the 2001 Oklahoma Statutes provides:

B. A principal may nominate, by a durable power of attorney, the conservator, guardian of his estate, or guardian of his person for consideration by the court if protective proceedings for the principal's person or estate are thereafter commenced. The court shall make its appointment in accordance with the principal's most recent nomination in a durable power of attorney except for good cause or disqualification.

Title 30, section 3–102(A) likewise provides for the nomination which "shall be binding on any court having jurisdiction of said guardianship subject to the disqualification of the nominee by the court."

In the ward's DPA, he nominated Kennemer as his guardian. It is unclear why the Wagoner County District Court appointed Kennemer and Russell as co-guardians given the ward's nomination and these statutory directives.

Unlike the Oklahoma Durable Powers of Attorney Act, 58 O.S.2001, §§ 1071–1077, the Okla-

homa Guardianship and Conservatorship Act imposes a guardian of the property with a fiduciary duty, 30 O.S.2001, § 1–121(B), to "keep safely the property of his ward...." Id. § 1–121(A).

**5.** Although a plan for the management of the ward's estate may have been filed, it is not included in the record before this Court.

**6.** The appointment of a guardian for an adult must be based on a finding of incapacity or partial incapacity. 30 O.S.2001, § 1–112(A).

**7.** The petition filed in Tulsa County District Court named "J.P.Morgan Securities, Inc., a subsidiary of J.P.Morgan Securities Holdings, LLC" as the defendant. Chase alleged that J.P. Morgan was improperly named as a defendant. The style of the case was changed to show Chase as the defendant after it was removed to the federal court.

ward's accounts and their balances, which are, likewise, not properly before this Court.

## II. ARGUMENTS

¶ 9 Russell's position is that the appointment of a general guardian effectively terminates a DPA, that a specific court order is required for transactions involving bonds and retirement accounts subject to a guardianship, and, thus, Chase breached a fiduciary duty by disbursing funds pursuant to the ward's DPA without a court order. Russell urges that, with the appointment of a general guardian, all of the ward's property subject to the guardianship proceeding is brought within the court's exclusive control. Russell concludes that the court has exclusive power to authorize the property's disposition which is inconsistent with the continuing existence of a DPA. As we view it, the thrust of Russell's argument is that there is a conflict between the Oklahoma Guardianship and Conservatorship Act (Guardianship Act), 30 O.S.2001, §§ 1–102 to 5–101, and the Oklahoma Uniform Durable Power of Attorney Act (ODPA Act), 58 O.S.2001, §§ 1071–1077, and that the Guardianship Act controls.

¶ 10 Chase argues that, under section 1074 of the ODPA Act, a DPA does not automatically terminate with the appointment of a general guardian but remains in effect until revoked by the guardian.[8] Chase concludes then that it was justified in honoring the ward's DPA after the appointment of a general guardian.

## III. THE OKLAHOMA UNIFORM DURABLE POWER OF ATTORNEY ACT

¶ 11 In 1988, Oklahoma enacted the ODPA Act.1988 Okla. Sess. Laws 1453–1455, ch. 293, §§ 1–11 (now codified at 58 O.S.2001, §§ 1071–1077). The ODPA Act is taken from the Uniform Durable Power of Attorney Act of 1979 (UDPA Act), 8A U.L.A. 233 (2003), and sections 5–501 through 5–505 the Uniform Probate Code (UPC), 8–II U.L.A. 418 (1998).[9] The ODPA allows a principal to create an agency which continues during incapacity or which becomes effective during incapacity. 58 O.S.2001, § 1073; Prefatory Note to UDPA Act, 8 U.L.A. 234 (2003); Prefatory Note to UPC, 8–II U.L.A. 418 (1998). The UDPA Act was developed as an alternative to court involvement in cases of incapacity, Prefatory Note to UDPA Act, 8 U.L.A. 234 (2003); Prefatory Note to UPC, 8–II U.L.A. 418 (1998), and gives a principal some control over who manages his property and person should the principal become incapacitated.

¶ 12 Subsection 1074(A) of the ODPA Act[10] provides:

> A. If, following execution of a durable power of attorney, a court of the principal's domicile appoints a conservator, guardian of the estate, or other fiduciary charged with the management of all of the principal's property or all of his property except specified exclusions, the attorney-in-fact is accountable to the fiduciary as well as to the principal. **The fiduciary has the same power to revoke or amend the power of attorney that the principal would have had if he were not disabled or incapacitated.**

(Emphasis added.) If the DPA was effectively terminated upon the appointment of a

---

8. Title 58, section 1072.2(B) of the Oklahoma Statutes, enacted in 1992, 1992 Okla. Sess. Laws 1076–1077, c. 274, § 6, provides in part:
   A person dealing with the attorney-in-fact shall not be required to inquire into the validity or adequacy of the execution of the power of attorney, nor shall any such person be required to inquire into the validity or propriety of any act of an attorney-in-fact apparently authorized by a power of attorney executed pursuant to this section.

9. Sections one through five of UDPA Act correspond to sections 1071 through 1077 of the ODPA Act and are identical to sections 5–501 through 5–505 of the UPC. See 58 O.S.2001, §§ 1071–1077; UDPA Act §§ 1–5 and Historical Notes, 8 U.L.A. 234–257 (2003); UPC §§ 5–501 to 5–505, 8–II U.L.A. 418–424 (1998). Thus, references to the ODPA Act include references to the parallel provisions in the UDPA Act and the UPC.

10. Subsection 1074(A) is identical to section 3(a) of the UDPA Act, see 58 O.S.2001, §§ 1071–1077 and accompanying Historical Notes; UDPA Act § 3(a), 8 U.L.A. 252 (2003), and to section 5–503(a) of the UPC. See UPC § 5–503(a), 8–II U.L.A. 421 (1998).

general guardian as Russell argues, there would be nothing for the guardian to revoke or amend, making the last sentence of subsection 1074(A) extraneous. Section 1074(A)'s plain language unambiguously expresses the legislative intent that the authority of an attorney-in-fact acting pursuant to a DPA does not automatically cease with the appointment of a guardian.

¶ 13 The legislative intent expressed in section 1074's plain language is supported by the comments to the UDPA Act and UPC. Section 1074's drafters wrote the UDPA Act and UPC so that the court appointment of a fiduciary, such as a guardian or conservator, would not automatically terminate the DPA but would leave it up to the fiduciary to determine if the agency is appropriate within the guardianship. Prefatory Note to UPC, 8–II U.L.A. 418 (1998). If a guardian is appointed, the attorney-in-fact becomes accountable to the guardian. *Id.* The guardian may revoke or amend the DPA the same as the principal if the principal were not disabled or incapacitated. *Id.*

■ ¶ 14 In further support of a DPA's continuing viability after the appointment of a general guardian, the ODPA Act provides only two methods for the termination of a DPA after a ward becomes incapacitated. The first is by the court-appointed fiduciary revoking the DPA. 58 O.S.2001, § 1074(A). The second is by the ward's death, with the exception that the ward's death does not revoke or terminate the agency as to a person who has no knowledge of the death and acts in good faith pursuant to the power. *Id.* § 1075(A).

## IV. THE OKLAHOMA GUARDIANSHIP ACT

¶ 15 The same year that it enacted the ODPA Act (1988), the Legislature enacted the Oklahoma Guardianship Act,[11] renumbering and substantially augmenting the existing guardianship statutes. 1988 Okla. Sess. Laws 1766–1832, ch. 329, §§ 1–138 (now codified at 30 O.S.1991, §§ 1–101 to 5–101). In support of his position, Russell cites numerous sections of title 30 of the Oklahoma Statutes dealing with guardianship.[12] Russell fails to inform this Court of the relevance of most of the cited statutes, fails to address how they support her position, and fails to apply statutory construction rules to explain why the guardianship statutes should control over section 1074's plain language.

■ ¶ 16 We do not disagree with Russell that, in a general guardianship all of a ward's property is subject to the control of the court having jurisdiction over the guardianship. A court having jurisdiction over the guardianship has exclusive jurisdiction to determine "how the estate of the ward shall be managed, expended, or distributed to or for the use of the ward or the dependents of the ward." 30 O.S.2001, § 1–113(A). The court having jurisdiction over the guardianship also has the exclusive jurisdiction "to control [the] guardian in the management and disposition of the person and property." *Id.* § 1–114(A). A general guardian is defined as "a guardian of the person or of all the property of the ward within this state or of both such person and property." *Id.* § 1–109(A). In relying on these guardianship statutes to reach the conclusion she draws, Russell fails to recognize that the guardianship statutes, when construed together are sufficiently broad as to allow a DPA to exist within a general guardianship.

■ ¶ 17 Under subsection 3–101(D) of the Guardianship Act, a person seeking to be appointed guardian of the property of an incapacitated or partially incapacitated person may attach, to the petition, a guardianship plan for the management of the ward's financial resources or submit the plan at the

11. The Oklahoma Guardianship Act was renamed in 1990 as the Oklahoma Guardianship and Conservatorship Act.1990 Okla. Sess. Laws 1624, ch. 323, § 1. The provisions relied on in this opinion are substantially the same in the 1988 and 1990 versions.

12. Russell alleges the following sections in title 30 of the Oklahoma Statutes clearly establish that, in a general guardianship, all of the principal's property is transferred to the exclusive control of the court having jurisdiction of the guardianship: 1–103, 1–109, 1–111(22), 1–112(B), 1–113, 1–114, 1–119, 1–123, 3–113(E), 4–705, 4–708, 4–709, 4–751, 4–752, 4–754, and 4–758.

time of the hearing on the petition.[13] *Id.* § 3–101(C). If a management plan is not submitted with the petition or at the time of the hearing, the guardian must submit one within two months after being appointed. *Id.* § 3–122(A). Letters are issued after the guardian's appointment which define the guardian's authority and power and are proof of the court's authorization for the guardian to act in accordance with the management plan and within the law. *Id.* § 1–111(15). Section 4–705 of the Guardianship Act specifically recognizes that the guardian is responsible for the day-to-day management of the ward's assets and requires the guardian to manage the ward's estate frugally and without waste. *Id.* § 4–705. The guardian may do this by the guardian's own actions, and there is nothing in the Guardianship Act which prevents the guardian from utilizing the attorney-in-fact, who is accountable to the guardian for her actions, in carrying out the guardian's duties.[14] See 58 O.S.2001, § 1074(A). As pointed out in *Rice v. Floyd,* 768 S.W.2d 57, 60 (Ky.1989), the UDPA Act and the UPC "allow the attorney-in-fact to continue to manage the principal's financial affairs, while the court-appointed fiduciary would take the place of the principal in overseeing the actions of the attorney-in-fact."

¶ 18 A year after the guardian's appointment, every year thereafter, and upon court order, the guardian of the property is required by statute to file a report, which shall contain a complete financial statement of the ward's financial resources over which the guardian has control or supervision and "an accounting of any receipts and disbursements received, or expenditures made" on the ward's behalf. 30 O.S.2001, §§ 4–303(A), 4–306(E). Since the attorney-in-fact is accountable to the guardian, and all of the ward's property is a part of a general guardianship of the property over which the guardian has control or supervision, the annual report will reflect transactions involving the ward's property made by the attorney-in-fact, as well as the guardian. *See id.* § 4–306(E). The court exercises its jurisdiction to determine "how the estate of the ward shall be managed, expended, or distributed" not by issuing specific orders for day-to-day expenditures[15] but by exercising control through its approval or disapproval the guardian's reports. *See id.* § 1–114.

¶ 19 Russell's argument that the Guardianship Act effectively terminates a DPA once a general guardian is appointed is

**13.** Section 3–101 was amended in 2007, but subsection D was unchanged. 2007 Okla. Sess. Laws 1700–1701, ch. 364, § 1.

**14.** The drafters of the ODPA Act by including the provision for nominating a guardian within section 1074 must have envisioned the person acting under a DPA would be the principal's nomination as guardian. In which case, the guardian could transact business on the ward's behalf either as a guardian or as an attorney-in-fact. 30 O.S.2001, § 4–705; 58 O.S.2001, § 1072.

**15.** Russell cites section 3–113(E)(1) of the Guardianship Act for the proposition "[t]hat specific orders of the guardianship court are required, especially as to such a weighty matter as an IRA (where the wife is guaranteed a joint and survivor interest by Congress) and bonds, for the invasion of said assets by a guardian is without question."

Subsection 3–113(E)(1) of title 30 of the Oklahoma Statutes provides:
E. The court may, in its discretion, make such further orders as the court deems necessary for the best interest of the ward for care of the ward and maintenance or management of the ward's property, including but not limited to:

1. order the guardian of the property of the ward to provide the ward from such property with specified amounts of money, monthly, or from time to time, which the ward may dispose of as the ward shall determine and for which, other than a showing of the amounts paid to the ward, the guardian will not be required to account. Such order may be modified upon application of the guardian or any interested person, and a hearing conducted thereon, with notice of the hearing on such application to be given to those persons entitled to notice pursuant to paragraphs 1, 2, 3 and 7 of subsection A of Section 3–110 of this title and shall be given as provided in Section 3–110 of this title....
We find nothing in this provision that requires a court to make specific orders for distribution from an IRA or from bonds unlike the requirement of a specific order for the sale of real property found in the Guardianship Act, sections 4–705 and 4–752. Section 4–705 provides in part: "[T]he guardian may sell the real estate, upon obtaining an order of the district court therefor...." Section 4–752 provides: "[T]he guardian may sell the same for such purpose upon obtaining an order therefor." Rather subsection 3–113(E)(1) provides for a periodic allowance to the ward for which an guardian need not account to the court except for the amount.

unconvincing. The Guardianship Act's scheme for the management of a ward's estate is sufficiently broad as to allow a guardian to manage the ward's assets through an attorney-in-fact. The guardian is then accountable to the court for any actions taken by the attorney-in-fact. If a guardian does not want to be accountable to the ward and to the court for the attorney-in-fact's actions under a DPA, section 1074 of the ODPA Act allows the guardian to revoke or limit the agency created by a DPA.

## V. THE ODPA ACT CONTROLS OVER THE GUARDIANSHIP ACT

■■■ ¶ 20 Our goal in construing statutes is to determine the Legislature's intent. *Benjamin v. Butler*, 2008 OK 83, ¶ 16, 194 P.3d 1269, 1273. If legislative intent is ascertainable from a statute's plain and unambiguous language, the statute's words will be given their obvious and ordinary meaning and will be followed without additional inquiry. *Id.* This Court construes statutes to avoid rendering any language superfluous. *See Bed Bath & Beyond, Inc. v. Bonat*, 2008 OK 47, ¶ 11, 186 P.3d 952, 955. A specific statute will control over a conflicting general statute on the same subject. *Glasco v. State ex rel. Okla. Dept. of Corrections*, 2008 OK 65, ¶ 17, 188 P.3d 177, 184. "Legislative acts are to be construed in such manner as to reconcile the different provisions and render them consistent and harmonious, and give intelligent effect to each." *Eason Oil Co. v. Corp. Comm'n*, 1975 OK 14, ¶ 9, 535 P.2d 283, 286.

¶ 21 Applying these rules leads to the conclusion that the ODPA Act, subsection 1074(A) controls over the Guardianship Act's provisions relied on by Russell. First, the language of the ODPA Act, section 1074 is clear that the Legislature intended that a DPA and guardianship coexist. To construe subsection 1074(A) otherwise would render the language giving the guardian the power to revoke or amend a DPA superfluous.

Second, title 58, section 1074 is a specific provision dealing with the continuation of a DPA after the appointment of a guardian. As such, it would control over the general statutes of the Guardianship Act upon which Russell relies. Third, nothing in the Guardianship Act requires the automatic termination of a DPA upon the appointment of a general guardian. In spite of Russell's urging differently, the guardianship statutes can be applied in a manner to accommodate section 1074.

¶ 22 Russell relies on *Rice v. Floyd*, 768 S.W.2d 57, 58–61 (Ky.1989), which recognizes that the UDPA Act provides "for the coexistence of durable powers and guardians or conservators, and the attorney-in-fact is accountable to the fiduciary and the principal," and allows "the attorney-in-fact to continue to manage the principal's financial affairs, while the court-appointed fiduciary would take the place of the principal in overseeing the actions of the attorney-in-fact." The *Rice* court noted that Kentucky does not follow the UDPA Act's section 3, which is identical to title 58, section 1074 of the ODPA Act, and that, unlike the UDPA, section 386.093 of the Kentucky Revised Statutes, at the time *Rice* was decided,[16] required the termination of the power of attorney upon the appointment of a fiduciary. *Rice*, in fact, supports Chase's position.

■■■ ¶ 23 Russell also cites *Prickett v. Moore*, 1984 OK 54, 684 P.2d 1191, for the proposition that a guardian cannot "bind the ward's estate by contract except for necessaries authorized by statute" and a ward cannot sever a joint tenancy. We note that *Prickett* was decided before Oklahoma law provided for a DPA. *Prickett* stands for the proposition that a ward cannot elect to sever a joint tenancy and that a guardian may not elect to sever a joint tenancy in the absence of valid judicial authority. *Prickett* has no application to the question before this Court.

¶ 24 Russell states *Corr v. Smith*, 2008 OK 12, ¶¶ 9–10, 12, 18, 178 P.3d 859, addresses

---

16. At the relevant time to the *Rice* decision, Kentucky law provided: "If a fiduciary is thereafter appointed by the court for the principal the power of the attorney in fact shall thereupon terminate and he shall account to the court's appointed fiduciary." Ky.Rev.Stat. Ann. § 386.093 (West 1987). In 1998, the Kentucky legislature deleted this language. 1998 Ky. Acts 1405–1406, ch. 421, § 2(5).

the issue presented by the certified question by "glibly stat[ing] ... that a guardian appointment voids a power of attorney." The issue in *Corr* was whether the court had authority pursuant to title 60, section 175.57(D) [17] to award the plaintiffs costs and attorney fees. The opinion does state: "The special guardianship rendered void the court-approved power of attorney Mrs. Corr had just given Mrs. Garrison." We reject that this necessarily supports Russell's position. There is no indication that this is anything more than a factual statement of the ward's mental capacity at the time of executing the power of attorney in favor of Mrs. Garrison rather than a legal conclusion. To the extent that it can be construed as stating that a guardianship automatically terminates a durable power of attorney, we reject this conclusion as inconsistent with title 58, section 1074.

## VI. CONCLUSION

■ ¶ 25 Title 58, subsection 1074(A) unambiguously provides for the coexistence of a guardianship and a durable power of attorney. Russell has failed to point to anything, and we find nothing, in the Guardianship Act which would operate to effectively terminate a durable power of attorney upon the appointment of a general guardian. Therefore, we answer that the appointment of a general guardian of the property does not automatically withdraw all of a ward's assets such that an attorney-in-fact is without power to act pursuant to a durable power of attorney.

**Certified Question Answered.**

EDMONDSON, C.J., TAYLOR, V.C.J., and HARGRAVE, KAUGER, WATT, WINCHESTER, COLBERT, and REIF, JJ., concur.

OPALA, J., concurs in result.

---

17. Title 60, subsection 175.57(D) of the 2001 Oklahoma Statutes provides: "In a judicial proceeding involving a trust, the court may in its discretion, as justice and equity may require, award costs and expenses, including reasonable attorney's fees, to any party, to be paid by another party or from the trust which is the subject of the controversy."