OSCN Found Document:IN THE MATTER OF THE GUARDIANSHIP OF BERRY

 
 
 
 OSCN navigation


 
 Home

 
 Courts

 
 Court Dockets

 
 Legal Research

 
 Calendar

 
 Help
 





 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only
 
 

 
 
 
 IN THE MATTER OF THE GUARDIANSHIP OF BERRY
2014 OK 56
Case Number: 111492 (Consol. w/111961); 112
Decided: 06/24/2014
THE SUPREME COURT OF THE STATE OF OKLAHOMA
Cite as: 2014 OK 56, __ P.3d __
NOTICE: THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL. 

IN THE MATTER OF THE GUARDIANSHIP OF FOSTER CALVIN BERRY and DAUGHTREY NELL BERRY, Husband and Wife, incapacitated persons,

JAMES BERRYHILL and ANITA BERRYHILL Appellants,
v.
JEFF K. RHODES, SEAN P. HENNESSEE, of RISELING & RHODES, P.C., and CHRISTOPHER I. MANSFIELD, Guardian, Appellees.
and
IN THE MATTER OF THE GUARDIANSHIP OF FOSTER CALVIN BERRY and DAUGHTREY NELL BERRY, Husband and Wife, incapacitated persons,

JAMES BERRYHILL and ANITA BERRYHILL, Petitioners,
v.
THE HONORABLE TERRY H. BITTING, SPECIAL DISTRICT JUDGE, TULSA COUNTY, STATE OF OKLAHOMA, Respondent.

AND

IN THE MATTER OF THE GUARDIANSHIP OF FOSTER CALVIN BERRY and DAUGHTREY NELL BERRY, husband and wife, incapacitated persons; JAMES and ANITA BERRYHILL and DAVID BERRY, Petitioners,
v.
THE HONORABLE TERRY BITTING, SPECIAL JUDGE OF THE DISTRICT COURT, TULSA COUNTY, STATE OF OKLAHOMA, Respondent.

APPEAL FROM THE DISTRICT COURT OF TULSA COUNTY AND
APPLICATIONS FOR EXTRAORDINARY RELIEF

¶0 A daughter was appointed special guardian for her parents. Two lawyers entered an appearance on behalf of the parents and alleged that the parents had selected them as nominated counsel. The daughter sought to be named guardian and then a nephew and niece of the parents sought to be named guardians. Upon agreement of the parties an independent guardian was named. Hearings were held and an order issued that (1) rejected the two lawyers as nominated counsel for the parents and (2) denied a motion to reconsider a previous denial of a motion for unsupervised visitation by the nephew and niece and change of guardian to the nephew and niece. The allegedly nominated attorneys commenced an appeal which the Supreme Court retained. The trial court also denied a motion for emergency relief to change supervised visitation. A request for extraordinary relief from supervised visitations was filed during the appeal and the request was consolidated with the appeal. Subpoenas duces tecum were quashed relating to the wards' trusts. An additional request for extraordinary relief was filed during the pendency of the appeal based upon the order quashing the subpoenas, and we treat that proceeding as a companion case. We hold that there is sufficient evidence to support the trial court's adjudication that nominated counsel had a conflict of interest and were not independent, and that the Petitioners failed to show that the trial court committed an abuse of discretion or acted in excess of its authority when it denied an emergency motion to modify the supervised visitation, and that while the trial court incorrectly ruled that it lacked jurisdiction to issue subpoenas duces tecum to a trustee of a ward's trust, it must hold a hearing on the objections to the discovery request and adjudicate which parties are entitled to participate in the discovery and determine whether a sustainable objection to discovery exists pursuant to the Discovery Code.

No. 111,492 Consolidated with No. 111,961: ORDER OF THE DISTRICT COURT DATED JANUARY 18, 2013 IS
AFFIRMED; ORIGINAL JURISDICTION ASSUMED; PETITIONS FOR
WRITS OF MANDAMUS AND PROHIBITION ARE DENIED.

No. 112,573:
ORIGINAL JURISDICTION ASSUMED; PETITION FOR WRIT OF PROHIBITION
GRANTED WITH DIRECTIONS

Appearances in Cause No. 111,492 & No. 111,961:

John B. Nicks, Crutchmer & Barnes, PLLC, Tulsa, Oklahoma, for James and Anita Berryhill.
Russell L. Mulinix, Lindsey W. Mulinix, Mulinix, Ogden, Hall & Ludlam PLLC, Oklahoma City, Oklahoma, for James and Anita Berryhill.
Jeff K. Rhodes and Sean P. Hennessee, Riseling & Rhodes, PC, Tulsa, Oklahoma, for Foster Calvin Berry and Daughtrey Nell Berry.
Clifton Baker and Steven Wyers, Baker & Wyers, PLLC, Tulsa, Oklahoma, nominated attorneys for Foster Calvin Berry and Daughtrey Nell Berry.
Randall A. Gill, Tulsa, Oklahoma, for Riseling and Rhodes, PC.
Randall E. Rose, The Owens Law Firm, PC, Tulsa, Oklahoma, for Peggy Jan Harris
William R. Grimm, Barrow & Grimm, Tulsa, Oklahoma, for Christopher Mansfield

Appearances in No. 112,573:

Russell L. Mulinix, Lindsey W. Mulinix, Sally Ketchum Edwards, Mulinix Ogden Hall & Ludlam, Oklahoma City, for James Berryhill and Anita Berryhill
Jeff K. Rhodes and Sean P. Hennessee, Riseling & Rhodes, P. C., Tulsa, Oklahoma, for Daughtrey Nell Berry.
Randall A. Gill, Tulsa, Oklahoma, for Daughtrey Nell Berry.
A. Scott McDaniel, Stacy L. Acord, McDaniel Acord, PLLC, Tulsa, Oklahoma, for Christopher Mansfield

EDMONDSON, J.

¶1 This proceeding involves a request for an extraordinary writ that is recast as appeal from an order in a guardianship that adjudicated the wards' selection of counsel and adjudicated a motion concerning unsupervised visitation and selection of a guardian.This proceeding also involves two requests for extraordinary relief that were made during the appeal.[1] The first involves an emergency motion for modification of supervised visitation and the second involves the trial court's order quashing subpoenas. The Berryhills state that there was no evidence to support the trial court's adjudications, so we turn first to the facts in the record before us.

I.

¶2 Foster Calvin Berry[2] and Daughtrey Nell Berry, husband and wife, are the parents of two adult children, Jan and David. In 2011 Jan became concerned about her parents and had a company which performs assessments on "elderly geriatric and disabled persons" assess her parents.

¶3 Jan filed in the District Court a verified petition seeking an emergency special guardianship. The petition related results from examinations or assessments performed on Foster and Daughtrey. Photocopies of Foster's and Daughtrey's August 2011 "Durable Power of Attorney and Nomination of Guardian" were attached as exhibits showing Foster and Daughtrey name each other as Agent (and guardian of the person) with each of their children, Jan and David, named as an alternate health care proxy and alternate guardian of the person of each.[3]

¶4 On Jan's verified petition, an emergency special guardianship hearing was held before the Honorable Kurt G. Glassco, District Judge. Jan testified that: (1) She knew that a law firm had represented her parents and had prepared an estate plan; (2) She knew that Edward Jones Company was the trustee of her parents' trust[4] and she was willing to continue that relationship; (4) She wanted to employ personnel necessary to provide 24-hour care for her parents; and (5) She was a "master's degreed social worker" employed by the U. S. Army, and that she possessed a certain security classification. On cross-examination she testified that until the last few months prior to the hearing she had visited her parents "about every third week," did minor repairs around their house, and transported her father to medical appointments. She testified that she had recently become concerned about her parents. She testified that "the elder care unit of the Department of Human Services" had been to her parents' house three times to check on them in the month previous to the hearing.

¶5 At the hearing, counsel informed the court that the caregiver for Foster and Daughtrey had "been reported to Adult Protective Services" resulting in "an on-going, open investigation." Counsel also argued that Daughtrey's son was prohibited by law from being named a guardian or serving in a fiduciary capacity for either of his parents. Jason Fields, from the firm of Riseling and Rhodes, appeared for both Foster and Daughtrey. Robin Owens appeared on behalf of Jan. Fields argued that there was no objection to Jan as an emergency special guardian of Foster and Daughtrey, but that she should not be named as guardian of their property. He argued that whatever estate planning the Berrys had previously put in place should remain without alteration by the court or a guardian. He argued that the Berrys had been scheduled to sign legal documents the day before the hearing, and that it was the opinion of the Berrys' financial advisor and an attorney at his firm concerning the Berrys' capacity: "they know what's going on."

¶6 Jan was appointed Special Guardian for her parents. The court also ordered that the powers of attorney previously executed by Foster and Daughtrey be "held in abeyance pending further Court Order." The order stated that the Special Guardianship would remain in force until 9:30 A.M. on Oct. 24, 2011, subject to further orders of the court. Id. The "Letters of Special Guardianship" were filed in September 2011, and limited the guardianship duties to management and control of certain aspects of the persons and estates of Foster and Daughtrey.

¶7 Four days after the hearing Clifton Baker and Steven Wyers, attorneys at law, entered appearances on behalf of Foster and Daughtrey as their nominated attorneys, and Foster and Daughtrey objected to the Special Guardianship. Their pleading requested an order suspending the Order and Letters of Guardianship naming Jan as guardian until a hearing to determine the capacity of the wards, and in the alternative to appoint either a guardian selected by the wards or a neutral guardian.

¶8 A hearing was held before the Honorable Millie Otey, Special Judge of the District Court. Jason Fields appeared for Foster and Daughtrey and argued that if they had the capacity to make the decision to hire new attorneys, then that would be their choice for counsel. He argued that because the court had previously determined that they were incapacitated "that calls into question their ability to be able to hire an attorney" and an evidentiary hearing was necessary to determine their choice of counsel.

¶9 At the hearing, counselors Baker and Wyers appeared for Foster and Daughtrey as nominated attorneys and requested that the rights of the guardian be "suspended or limited" until an evidentiary hearing be held. Attorney Baker explained that James Berryhill, Foster and Daughtrey's nephew, and James' wife, Anita, brought Foster and Daughtrey to his office seeking relief from the guardianship. After hearing argument and testimony from witnesses, Judge Otey specified that the Berrys be returned to their home after having been removed by the Berryhills, and that the Berrys be provided with health care at home twenty-four hours a day, seven days a week.

¶10 The judge also ordered that Foster and Daughtrey's son could have supervised visitation with his parents, and that the Berryhills could have supervised visitation with Foster and Daughtrey. Judge Otey also suspended all powers of attorney until termination or reinstatement by another judge who was assigned to hear the controversy. She also ordered that the Berrys have access to any of their funds in order for them to be able to sustain their lifestyle. She ordered that keys to the home be given to the guardian, agent for the guardian, the wards, and the home healthcare company. She ordered that the Berryhills not be given a key to the home. For much of this hearing the Berryhills had been outside the courtroom and no counsel had entered an appearance on their behalf, but at one point Mr. Baker informed the court what the Berryhills would testify to if called as witnesses. Tr. at 55. Mr. Wyers was then directed to go out into the hallway to determine if the Berryhills still possessed financial documents they had removed from the Berrys' home to a location in the State of Texas. Tr. at 57. The judge directed counsel to have the Berryhills come into the hearing where the judge ordered them to return the documents.

¶11 Judge Otey entered a temporary protective order that required a person employed in the home by the Berrys, Dee Penney, to have no contact with the Berrys until the assigned Judge made a determination on her employment in the home. The judge also ordered neuropsychological testing with a report to be made to the judge assigned to the controversy. After discussion of counsel, the judge ordered counsel for the special guardian, then present counsel for the Berrys, and nominated counsel for the Berrys to each provide a list of four names of professionals who customarily perform such tests for the judge to select a name for the person to perform the tests.

¶12 The day after the hearing Baker and Wyers filed a motion for an emergency hearing "on a clarification and interpretation of the Court's orders, for clarification of the amount and extent of the Guardian and/or her Agent, to control the Wards' lives, and to define the extent or limitations on Wards to continue their lives; consideration of removal of the Agent; for consideration of a Co-guardian located in the state who can act with authority for the best interests of the Wards; and for attorney fees on the prosecution and conclusion of this unnecessary Motion to protect the interests of the Wards." O.R. at 68, 70-71. The allegations of the motion included that a caregiver was employed by Jan for her parents, and that this agent for Jan impermissibly restricted the wards from moving freely whenever and wherever they choose, and that other restrictions imposed by Jan and this agent were undue burdens and restrictions on their "lifestyle of freedom." O.R. at 70.

¶13 On October 7, 2011, Jan filed a petition for the appointment of a general guardian for her father and mother. On October 21, 2011, James and Anita Berryhill filed a Petition For Appointment of Special and Limited Co-Guardians for the purpose of them being named guardians for Foster and Daughtrey. Exhibits to the application were "Nomination of Co-Guardians" signed by Foster and Daughtrey that named James and Anita as the co-guardians of their persons and estates. The nominations of co-guardians were dated October 21, 2011. The attorney filing the Petition was Clifton Baker. O.R. at 115, 119. One week later a Notice of Substitution Of Counsel was filed giving notice that Baker and Wyers were withdrawing as counsel of record for James and Anita Berryhill and Matthew Hall was therein entering an appearance as counsel for James and Anita Berryhill. James and Anita filed an objection to Jan's petition for appointment and they alleged that facts stated in Jan's petition were not correct.

¶14 The record on appeal contains an Order Appointing General Guardian stating that on October 24, 2011, a hearing in the District Court was held and that appearances were made by Daughtrey along with several lawyers. The order states that testimony was heard and the pleadings were examined. The adjudications and determinations of the assigned trial judge, Judge Terry Bitting, included but are not limited to the following: that proper notice of the proceeding had been given, that Foster and Daughtrey were residents of Tulsa County, that Jan had standing to petition for the appointment of a guardian, the Court had previously appointed a Special Guardian of the Person and Estate of the Wards, the evidence was clear and convincing of incapacity of the wards as to all aspects of daily living, testimony of Daughtrey included that Foster could not attend due to a fall resulting in cracked ribs and a painful condition requiring rest, that the health and safety of the wards would be seriously affected unless action was taken by the court, the wards were subject to deception, undue influence, and exploitation as to their financial resources, and that a general guardian should be appointed for their person and property because no less restrictive alternative was available at that time to provide the wards with necessary care and assistance. The order states that "By agreement of the parties and their counsel, Christopher I. Mansfield is appointed General Guardian of the Person and Estate of the Wards." O.R. at 148. The order required the wards to meet with a specified person and that person's staff for examinations. The order required the Berryhills to deliver to the general guardian "all tangible and intangible property belonging to the Wards which is currently held by the Berryhills."

¶15 All other pending issues were ordered to be held in abeyance until the report of the examinations was filed with the court. The protective order remained in effect and the supervised visitation remained in effect. The trial judge also determined that it was necessary to order that "The parties will abide by the Judicial Order of Proper Conduct and shall not discuss the Guardianship, financial matters or make derogatory remarks about the parties to the Wards."

¶16 Judge Bitting's Order for Proper Conduct included directions to the relatives of the Wards to not argue or fight in the presence of the wards. They were also directed to keep their visits short and pleasant with the Wards and not to criticize other relatives and the litigation or discuss any other topic likely to cause the wards to become agitated.

¶17 A hearing commenced in April 2012 with the assigned judge directing the lawyers in the case to limit their motions to raising facts and law in a professional manner, and she directed them to stop making personal attacks in motions filed with the court. This hearing was on a motion brought by the general guardian to dismiss allegedly improperly filed claims and for legal fees. The Berrys were not present. Attorney Baker testified that he had visited with the wards in a "private attorney-client relationship conference" the day before the hearing and that they knew that a hearing was being held. Attorney Wyers, also in a representative capacity for the wards, stated that James Berryhill had contacted his office to state that the wards had declined to attend due to the actions of the guardian. Attorney Baker stated that he had not been stopped from meeting with the wards. A recess occurred, a telephone call was made, and upon the court reconvening the Berrys were in attendance.

¶18 The guardian testified that various loving family members had different perspectives on what was best for the Berrys and that the Berrys were "in the proverbial tug-of-war." He testified that the Berrys could stay in their home with 24-hour assistance "but it isn't going to be a true, practical outcome if everybody can't stop aggravating and upsetting them." He reiterated that "just because people are not adult enough to put their personal feelings aside, Mr. and Mrs. Berry are caught in the middle of a family tug-of-war." Mansfield argued that while the "neuropsych" had been filed as ordered, several inappropriate filings had occurred and should be stricken, fees should be assessed, and "assets be returned appropriately for the use of the wards, . . . the greater purpose for me and should be for everybody else is to let these people have a peaceful, happy life."

¶19 Judge Bitting noted that both the wards were present and that she wanted the wards to testify as to any lawyers they wanted to represent them. The transcript of this hearing then shows long arguments from the lawyers giving their respective views on what they perceived to be the facts of the case including unsworn allegations concerning the mental status of the wards, the use of their funds by various individuals, objections to the mental examination reports, whether Baker and Wyers also represented the Berry's son David in a "trust action" that had occurred in the District Court simultaneous to the guardianship, time for the attorneys to prepare for a hearing on the wards' selection of counsel, and whether the court should appoint a guardian ad litem for the wards. The Court ordered that a hearing be scheduled on the issue of the wards' selection of counsel.

¶20 One week later the parties were back in court for a hearing on the selection of counsel by the wards. Counsel for the Berryhills and nominated counsel for the Berrys argued that the status of the guardianship should be addressed first. The Court disagreed, and attorney Baker was sworn as a witness and testified. He testified that his representation of the Berrys commenced on September 29, 2011, after having previously met them two to three days earlier. He testified that James Berryhill contacted his office to determine if he handled guardianship cases, and then on that day the Berryhills drove the wards to his law office and introduced the Berrys to him. He testified that when he met with the Berrys he was informed that they were subjects in a guardianship proceeding. He testified that he had "concern" because estate planning documents had been prepared by a different attorney and signed by the wards several weeks prior to his meeting with the wards, but that he saw no reason to contact and inform that lawyer of his representation of the wards because Baker's representation was in a guardianship, an issue he considered to be separate from estate planning.

¶21 Baker testified that James and Anita Berryhill gave him a check for $5,000 on September 26, 2011, to initially retain him for his legal services for the Berrys. He testified that the source of the funds was from "Mr. Berryhill's or Mrs. Berryhill's checking account." Tr. May 30, 2012, p. 53. He testified that he had been informed by the Berryhills that they wanted a guardianship for the Berrys. Baker testified that the Berrys indicated that they did not want a guardianship. Tr. at p. 54. However, he also testified that the Berrys thought they should be under a guardianship. Tr. at p. 55-56. Baker testified that in his opinion it was not a conflict of interest to be paid from two people seeking to be named guardians while representing wards who objected to the guardianship. Tr. May 30, at p. 54. He testified that he had filed a petition for guardianship on behalf of the Berryhills and then did a "substitution of counsel." Tr. at p. 56. He testified that he represented the Berryhills "pro bono" and that he did not recall who had paid the filing fee. Tr. at p. 57. He testified that his representation of the Berryhills was "for one day." Tr. at p. 57.

¶22 Baker testified that he also represented the Berrys' son, David, in an action "to challenge the trust" of his parents, "not trying to break it" but "just challenging the most recent version of the trust." Tr. at 58. He testified that while he would not represent the Berrys concerning their estate plan because they already had a lawyer for that, it was permissible for him to represent someone else with regard to the Berrys' estate plan in the context of challenging or seeking to change that plan with regard to the Berry's trust. Trans. at p. 57-58. He stated that David did not pay him legal fees, he represented David pro bono, and that he did not probably keep records of the time he spent working on David's case.

¶23 At the hearing on July 11, 2012, Dr. Bianco testified he administered reading, comprehension, and memory tests to the wards. Tr. at 58, 60-61. He testified concerning the wards' ability to comprehend what they read as well as problems with comprehending and remembering what was read to them. Concerning Daughtrey's understanding a contract, he testified concerning her difficulty understanding what she read, and what she would not remember or retain. Tr. at 16. When questioned concerning his diagnosis and a previous test administered by Susan Boyd, Dr. Bianco stated that "I looked at it. I didn't include it in my diagnosis criteria." Tr. at p. 33. He also gave his opinion concerning their ability to be cognizant to execute documents within thirty to sixty days prior to the commencement of the guardianship. Tr. at 46.

¶24 Daughtrey testified she did not know who was in charge of her trust, and that it could be 20 years since she named a trustee. Tr. at 58, 60-61. (Evidence was presented in the hearings concerning documents signed by Foster and Daughtrey a few weeks before the guardianship for a change in a corporate trustee.) She stated she did not know whether Baker had represented someone else in litigation involving her trust and that she would "be surprised" if "he wouldn't work with us about our trust." Tr. at 62. She testified that if Baker worked with someone else concerning her trust it was without her knowledge or permission. Tr. at 62.

¶25 When questioned whether she had a lawyer, she pointed to Mr. Baker but appeared to have difficulty stating his name. Tr. at 63-64. After being told his name, she stated that Baker and Wyers were her lawyers and she wasn't sure whether she had any previous lawyers. She testified she hired Baker three or four years previously. Tr. at 65. When asked by the guardian why she hired Baker, she asked Mr. Baker for assistance in answering the question. Tr. at 66. She testified she hired Baker to do "whatever lawyers do." She testified she was comfortable with Baker, liked him, and wanted him to be her lawyer. She testified the Berryhills were her present guardians. Tr. at 75. She also testified Mansfield was her guardian, and she gave permission to Baker for Mansfield to be her guardian. Tr. at 77. She testified she had caretakers in her home "around the clock" and "They're doing a good job." Tr. at 84. She testified the Berryhills assisted her in finding Mr. Baker and that, when asked if the Berryhills "sit in meetings with you when you met with Mr. Baker," she answered "I think so." Tr. at. 68. She testified she was "not sure" whether the Berryhills participated and spoke during those meetings. Tr. at 68.

¶26 Foster Berry had been absent from some of the proceedings due to medical issues but was able to attend a hearing in October 2012. He testified he loved both of his children, Jan and David. He testified his daughter was "very pleasant" and that he had "very fine" relationships with her and David. He testified he became aware of the guardianship that was filed in 2011 "five, six, seven years ago I guess." Tr. at 12. Foster testified he remembered going to Baker's law office but he could not remember why. Id. He testified he remembered meeting Baker's law partner, but could not remember what was discussed. Id. When asked by Baker if he remembered going over guardianship papers with him, Foster testified, "Yes." He testified he preferred James Berryhill and his wife Anita as his guardians instead of his daughter Jan. Foster also testified he did not remember who drove him to Baker's office and that he did not remember meeting Baker at his office. Tr. at 20.

¶27 Baker asked Foster a leading question concerning whether Foster wanted Baker and his partner to represent him, an objection thereto was sustained; and then after an additional question with Baker explaining to opposing counsel that Baker was asking Foster to identify who he wanted as counsel, Foster testified that he wanted "You and your partner." Tr. at 22. Then on cross-examination Foster testified that he did not know Baker's partner. Tr. at 23.

¶28 Foster testified he remembered hiring Mr. Riseling "probably eight or nine years ago" but would not disagree if someone said he hired him in 1988. Tr. 26. He testified he did not know why he had not hired Riseling for the guardianship. He testified he hired Baker on the suggestion of his niece.

¶29 Steve Care testified he had been financial advisor to the Berrys for 18 years. He testified he thought that the Berrys were pleased with the representation of the Riseling & Rhodes firm and it surprised him that they obtained Mr. Baker for representation in the guardianship. Tr. at 48. He testified he had never specifically inquired of the Berrys whether they had any preference on their choice of counsel.

¶30 Jason Fields testified he had represented the Berrys at previous hearings due to his employment with Riseling and Rhodes, and he had not assisted with planning, filing, or "putting together" the guardianship by Jan Harris. Tr. at 57. He testified the firm asked him to contact the Berrys and he had a conversation with Mrs. Berry Tr. at 62. He testified Mr. Rhodes of the firm spoke with Mr. Berry. Tr. at 64. He stated he had an appointment for the Berrys to meet with him at his office and on the same day they went to meet with Mr. Baker instead. Tr. at 65. He testified he had argued against the guardianship; and in the alternative, that if the court imposed a guardianship it should be in accordance with the Berrys' estate planning documents. Id.

¶31 Additional testimony was given by Clifton Baker. He testified he had filed an entry of appearance for David Berry in the guardianship proceeding for both Baker and Wyers. Tr. at p. 71. See O.R. at p. 281. Baker's entry of appearance stated that David was the son of the wards, beneficiary of their trusts, designated as attorney in fact in the wards' power of attorney, and was a petitioner in two related and specified causes, and that David requested that all correspondence and pleadings be directed to his counsel, Baker and Wyers. O.R. at 281. Baker signed both the appearance and the certificate of mailing. Concerning this appearance, Baker testified that "I don't have any memory of doing it or why." Tr at 72. Baker testified he never considered himself as representing David Berry in the guardianship case, and he did not know of any conflict of interest between David Berry and his parents. He testified that, if the court approved his nomination as lawyer for the Berrys, then he would be willing to file a withdrawal of his representation for David. Tr. at 73.

¶32 The trial judge's decision was filed in January 2013. The order stated that a Holly hearing was held on May 30, July 30, August 17, and October 31, 2012, and that the judge had considered the testimony. The judge rejected Baker and Wyers as the wards' choice of counsel, and left the wards represented by attorneys they had employed several years earlier for estate planning, the law firm of Riseling & Rhodes.

II. Procedural Posture of Choice-of-Counsel Appeal

¶33 An application for an extraordinary writ was filed in this Court and review of the judge's order was sought. The application for an extraordinary writ requested relief from two adjudications made by the trial judge that were memorialized in the form of a single order. The first involved the choice of lawyers made by the wards. The second was a challenge to an order which restricted the access of the parents to certain individuals including members of their family.

¶34 Several statutes defining orders as appealable focus on the nature and substance of the order,[5] and we have stated that appealability is based upon "orders defined by statute to be subject to immediate appellate scrutiny."[6] For example, appellate jurisdiction is invoked to review final orders,[7] judgments,[8] an enumerated class of interlocutory orders,[9] and a separate class of interlocutory orders where the exercise of appellate jurisdiction is discretionary.[10] Interlocutory orders that are not made subject to immediate appellate scrutiny may nevertheless obtain appellate scrutiny upon an appeal from a subsequent appealable order or judgment.[11]

¶35 In addition to the general statutes for civil procedure codified in Title 12 of the Oklahoma Statutes, the Legislature has provided for appeals in specific types of proceedings. For example, in 30 O.S.2011 § 3-106(A)(6) the Legislature provided for an appeal by an individual who is alleged to be or found to be an incapacitated person. This statute provides an appeal for this person to appeal "adverse orders and judgments as provided by the rules of civil procedure."[12] In addition to 30 O.S. § 3-106, certain orders in guardianship cases are made appealable by 58 O.S.2011 § 721.[13] Application of these statutes requires examining the nature of the decisions brought for our review.

¶36 The first decision of the trial court rejected Baker and Wyers as the wards' choice of counsel, and left the wards represented by attorneys they had employed several years earlier for estate planning, the law firm of Riseling & Rhodes. In Towne v. Hubbard, 1999 OK 10, 977 P.2d 1084, we explained that an appeal from an order adjudicating a ward's choice of counsel was an appeal from an interlocutory order pursuant to § 721 as an appeal from an order affecting a substantial right: "An appeal may be taken from the following judgments or orders of the district court: . . . 10. From any other judgment, decree or order of the court in a probate cause, or of the judge thereof, affecting a substantial right." 58 O.S.2011 § 721(10).

¶37 Section 721 refers to an order in a "probate cause" and a guardianship is one type of probate cause.[14] Additionally, in Towne we supported our conclusion on the appealability of an order adjudicating one's choice of counsel with a citation to State ex rel. Reirdon v. Marshall County Court,[15] where we explained that an order affecting a substantial right in a probate cause was appealable and that this type of probate appeal does not require a final order as in an ordinary civil appeal.[16] We expressly stated that the appeal was from an interlocutory order, and repeated this characterization of the order in the subsequent Towne opinion in 2000.[17]

¶38 We have recast an application for extraordinary relief to a petition in error when a party complained that a ward did not receive a constitutionally proper evidentiary hearing on the issue of a ward's choice of counsel, and when the application for extraordinary relief was filed within the time to commence an appeal.[18] The petition for an extraordinary writ was filed in this case within the thirty-day requirement specified in 12 O.S.2011 § 990A for commencing an appeal of an interlocutory order.[19] We thus recast the challenge to the trial court adjudication on the issue of the wards' choice of counsel as a timely appeal from an interlocutory order pursuant to 58 O.S. § 721(10) and 12 O.S.§ 990A.

¶39 The choice-of-counsel order is an interlocutory appeal made appealable by the nature of the trial court's adjudication; i.e., a choice-of-counsel adjudication affecting a substantial right. However, appeal from an order adjudicating one's choice of counsel does not make the other unrelated issues in that order also appealable.

¶40 In Conterez v. O'Donnell,[20] we stated:

All prejudicial error that stands preserved by the record through an intermediate order or proceeding that precedes any appealable decision is inchoately reviewable together with all other errors asserted to be present in the appealable disposition before the court. This common-law concept of reviewability is explicitly embodied in the terms of 12 O.S.2001 § 952(a). An aggrieved party has the unquestionable right to secure review of every preserved prejudicial error committed at nisi prius in the course of proceedings which precede an appealable decision.

2002 OK 67, ¶ 10, 58 P.3d at 762 (note and emphasis omitted).

This language does not allow all issues and disputes in a cause or controversy to become part of a subsequent interlocutory appeal in the cause. The statute cited, § 952(a), expressly states that the Supreme Court "may reverse, vacate or modify judgments . . . and in the reversal of such judgment may reverse, vacate or modify any intermediate order involving the merits of the action, or any portion thereof." 12 O.S.2011 § 952(a) (emphasis added and material omitted). The quoted language from Conterez refers to appellate review of orders anterior to judgment that are reviewed in an appeal from a judgment. Similar language appears in State v. One Thousand Two Hundred Sixty-seven Dollars, where the Court also relied upon § 952(a).[21] Conterez and State v. One Thousand Two Hundred Sixty-seven Dollars, are consistent with our opinions explaining that intermediate or interlocutory orders anterior to judgment may be reviewed on appeal from the judgment.[22] We have before us an appeal from an interlocutory order. We do not have an appeal from a judgment and the language in Conterez and similar opinions on the scope of appellate review does not apply to the present controversy.

¶41 If the substance of an interlocutory order contains both adjudications of issues that are immediately appealable and adjudications on other issues that are not immediately appealable, then only that part of the order adjudicating immediately appealable claims may be reviewed on an immediate appeal of the interlocutory order. For example, in Whig Syndicate, Inc. v. Keyes, the trial court stated that it was entering a "judgment" on five issues, one of which was whether class action relief was proper.[23] In Whig Syndicate this Court explains that an order certifying or refusing to certify an action to be maintained as a class action is appealable even though interlocutory,[24] but that the other four interlocutory issues are not immediately appealable and they "are in no posture for appellate review."[25] We first focus on the choice-of-counsel issue which is construed as part of a timely and proper appeal.

III. Wards' Choice of Independent Counsel

¶42 Jason Fields testified that he appeared on behalf of Foster and Daughtrey because of his association with the firm of Riseling and Rhodes and at the direction of attorney Rhodes after his conversation with Foster. Baker and Wyers state that they have been the attorneys for Foster and Daughtrey pursuant to an agreement their clients signed after the guardianship was created and their wishes expressed in testimony to the court.

¶43 In In re Towne, we held that a prospective ward is entitled to an attorney of his own choice unless the trial court concludes after an evidentiary hearing that the attorney is not independent or has a conflict of interest.[26] After hearing several witnesses at more than one hearing and providing everyone involved an opportunity to present evidence and argument, the trial judge made several findings and concluded that Clifton Baker and Stephen Wyers were not independent and had a conflict of interest with the interests of the wards.

¶44 The trial court's findings included the following. The Special Guardianship was created on September 23 and three days later the Berryhills responded to that proceeding by transporting the Berrys to the firm of Baker & Wyers which had been selected by the Berryhills. The Berryhills transported Daughtrey to a bank to remove $182,191.26 from Daughtrey's account(s) and the funds were deposited into Anita Berryhill's account at a different financial institution. Personal financial documents of the Berrys which had been in their home were removed by the Berryhills to a location in the State of Texas. We note that Baker testified that he received a $5,000 check as a retainer from Anita Berryhill three days prior to the creation of his contract to represent the Berrys. May 30, 2012, Tr. at 52.

¶ 45 The $5,000 retainer paid from Anita Berryhill's funds was in addition to $15,000 also collected as a retainer by Baker and Wyers. In May of 2012, James and Anita Berryhill filed an application in the trial court for reimbursement from the Berrys claiming that they had spent their own funds on behalf of the Berrys, including the $5,000 paid to retain Baker and Wyers and a $2,000 loan to Foster in order for him to open an account at a credit union. O.R. at 321-325. This application states that Mr. Wyers met with the Berryhills at a credit union where $182,191.26 was deposited into Anita Berryhill's account "with the Wards listed as beneficiaries if anything were to happen to Anita Berryhill." O.R. at 322. The application also states that both Mr. Wyers and Mrs. Berry were with the Berryhills at the credit union, and upon direction from Mr. Wyers an additional retainer of $15,000 was paid to Mr. Wyers for legal services. Id. The Berryhills state that when the special guardian, the Berrys' daughter, discovered the credit union accounts and made an attempt to "acquire" the funds, they then transferred most of the funds to a Bank of America account. They state that when they transferred funds to Bank of America, Foster told the Berryhills to reimburse themselves for the initial $5,000 payment to Baker and an additional $2,000 used to open a credit union account in Foster's name. Anita Berryhill states she advanced from her own funds weekly amounts to Daughtrey. She also stated she advanced her own funds to cover checks written by David Berry for the benefit of his parents. She claimed that she had given money to David at the direction of Daughtrey and she sought recovery for these funds. She also claimed she had spent her own funds for the benefit of the Berrys, including money spent on meals for the Berrys, mailing packages of the Berrys' financial documents which had been in her possession to the guardian and counsel for the special guardian, and medication she bought for Foster. Id. Many of the amounts for which she sought restitution from the Berrys were based upon expenses which she had alleged to have made prior to the date that Baker and Wyers filed an appearance in the District Court on behalf of the Berryhills and sought a guardianship status for the Berryhills over the Berrys.

¶46 The trial court's findings also included the following. Upon notification of the special guardianship, the Berrys were removed from their home by the Berryhills and allegedly taken to the Berryhills' home in Texas. The actions were taken without the court's permission, and without notice to, or permission of, the special guardian. Susan Boyd, R.N., who was managing the Berrys' care pursuant to employment by the special guardian, requested that the Berrys be returned home and an employee of Adult Protective Services made the same request. Judge Otey then ordered that the Berrys be returned to their home, and that the Berryhills return the Berrys' financial documents by sending them to counsel for the special guardian. Judge Otey specifically ordered that keys to new locks on the home be given to the Berrys, their guardian, and care manager, and that a key was not to be given to the Berryhills.

¶47 The decision of the trial court further states that "The Court Ordered the Wards' monies returned to the Guardian, which was accomplished with resistance. The need for the Berryhills' communications with wards to continue to be monitored should come as no surprise." O.R. at 664, 670. The decision then states that: "The Berryhills did not fully return all of the funds removed from Daughtrey Berry's account(s)." Id. The court stated that "Particularly concerning to the Court was testimony about funds belonging to the Berrys, being removed from Daughtrey Berry's account(s) and being placed in the name of Anita Berryhill, after knowledge that a Special Guardian was in place and with knowledge and participation of Wards' nominated counsel." Id. at 672. The court made a finding that the transfer of funds was "with knowledge and assistance of the nominated attorneys [and such] is further evidence of attorneys lack of independence and further that there is a conflict of interest." O.R. at 673 (explanatory phrase added).

¶48 Additional findings of the court in its decision included the following. Baker appeared before the Honorable Millie Otey on September 27, 2011, "in the capacity of challenging the guardianship." Less than a month later, on October 21, 2011, Baker filed a petition on behalf of the Berryhills for them to be named guardians of both the persons and property of Foster and Daughtrey. We also note that on that same day Baker and Wyers also filed an entry of appearance on behalf of the Berryhills. The court also made a finding that Baker and Wyers had entered an appearance on behalf of Berry's son, David, and Baker testified that he represented David in a contemporaneous proceeding involving the Berrys' trust. Further, "The Court observed that on occasion when the Wards were not present, that when nominated counsel were asked where his clients were, Mr. Baker asked the Berryhillls whether the Berrys were coming to court." O.R. at 674.

¶49 Nominated counsel, Baker and Wyers rely upon testimony of Foster and Daughtrey that the wards stated that they wanted Baker and Wyers as counsel. The trial court recognized this, but concluded on these facts that Baker and Wyers were not independent, and that the wards lacked the capacity to understand the conflicts of interest and then knowingly waive them. The court's decision noted that the report of Dr. Bianco discussed the wards being subject to "manipulation, undue influence, coercion, deception, duress, harassment and false representation" relating to mental deficits. The trial court stated that: "It was clear from the testimony of witnesses and from the Court's observation of both wards during many hearings that . . . Mrs. Berry often did not recall why she was there, even after numerous explanations by the Court . . . Both Wards had difficulty in subsequent hearings recalling events close in time to hearing dates . . . [and] Mrs. Berry, in particular, was very easily led during testimony and it was evident that she was concerned about giving the 'right' answers. She would begin to make statements when other witnesses were testifying and would read from a pad of paper she kept with her." O.R. at 671. Mrs. Berry testified that she was "pretty sure" that she gave Baker permission to agree to Mansfield being the guardian and that he was still her guardian. However, she also testified at the same time that her guardian was "Anita and Jim [Berryhill]."

¶50 We have explained that judicial removal of a litigant's choice of counsel in a non-guardianship proceeding is used "under limited circumstances, where honoring the litigant's choice would threaten the integrity of the judicial process."[27] We also explained that "disqualification is such a drastic measure that it should be invoked if, and only if, the Court is satisfied that real harm is likely to result" and that the burden of the moving party must be shown by a preponderance of the evidence.[28] However, in the context of a guardianship proceeding the procedure and the purpose for disqualification statutorily is slightly different in that the court makes an independent inquiry[29] for not only conflict and a lack of independence on the part of counsel, but also if the representation would be detrimental to the best interest of the ward.

G. In all cases where independent counsel is retained by or on behalf of the subject of the proceeding, the court shall make independent inquiry to determine whether counsel is independent and whether any conflict of interest exists which would preclude proper representation of the subject of the proceeding or which would be detrimental to the best interest of the subject of the proceeding. The court shall appoint other counsel where retained counsel is found not to be independent.

30 O.S.2011 § 3-107(G) (emphasis added).

The issue whether a ward's choice of counsel may be judicially denied pursuant to § 3-107 based upon a best-interests finding in the absence of a showing that the ward's choice has a conflicting interest or lacks independence is a question that is not before us. The trial court's ruling herein is based solely on a determination that Baker and Wyers had a conflict and lacked independence.

¶51 Baker testified at the initial meeting with the Berrys he knew of the guardianship proceeding, and the Berrys did not want a guardianship. May 30, 2012, Tr. at 53, 55. He also testified the Berryhills wanted a guardianship. Id. Tr. at 54. He then testified no conflict of interest existed because the Berrys had changed their original position and they had come to believe that they should have guardians. Id. Tr. at 55-56. Baker testified that at the time he was hired the Berrys did not have a lawyer for the guardianship because the legal representation then being provided by Mr. Rhodes involved estate planning. Tr. at 44.

¶52 Baker testified the work Mr. Rhodes performed related to the Berrys' trusts and powers of attorney. Tr. at 40-41. Baker testified he thought it would be improper for him to do estate planning for the Berrys. Tr. at 45. However, although Baker recognized that the Berrys' trust was part of their estate planning, he agreed he appeared on behalf of David in a contemporaneous proceeding for the purpose of challenging part of that trust. The record clearly shows the trust was used to provide funds for the daily needs and wants of the wards, and that Baker and Wyers knew that a guardianship "had been filed" and had directed a $15,000 payment of the Wards' funds to themselves with the assistance of the Berryhills without permission of the special guardian or the guardianship court. The record clearly shows Baker was aware that payments were being made by Anita Berryhill from her own funds for the Berrys, including the $5,000 retainer paid to Baker; further, that he knew that the $5,000 payment was for representing two wards in a guardianship.

¶53 In a guardianship proceeding the procedure for payment of compensation to attorneys, guardians ad litem, and persons conducting evaluations is provided by a statute,30 O.S.2011 § 4-403.[30] Section 4-403(C) states that attorney's fees for representing a ward should be approved by a court prior to payment. We have recently noted this principle when we explained that guardianship court approval may be sought of a contingency fee contract after execution of the contract.[31]

¶54 Instead of seeking payment of attorney's fees through the guardianship court, Baker first accepted a $5,000 retainer from Anita Berryhill, and we assume that Baker's knowledge of guardianship law was sufficient for him to know that Anita Berryhill could seek restitution for payments she made on behalf of the wards from funds belonging to the wards that were subject to the guardianship jurisdiction of the District Court. Wyers accompanied or met the Berryhills and the wards at a financial institution and directed that an additional $15,000 retainer be paid to him for the representation provided by Baker and Wyers. The testimony is that the $15,000 was paid from the wards' funds that the Berryhillls were trying to keep from being controlled by the special guardian; that is, the Berryhills were admittedly trying to keep the funds from the supervision provided by a guardianship court, and giving themselves supervision over those funds. Baker and Wyers, knowing that a guardianship proceeding was pending, sought and obtained $20,000 as a retainer through checks written by the Berryhills without seeking court approval.

¶55 In addition to the financial relationship Baker and Wyers had with the Berryhills, we note that testimony revealed that as the guardianship progressed the wards' views of the guardianship changed from being antagonistic to being completely compliant with the relief requested by the Berryhills in their application. Baker and Wyers executed a contract to represent the Berrys, who said they did not want a guardianship, and three weeks later Baker and Wyers filed an application on behalf of the Berryhills to be named guardians for the Berrys. A ward may certainly change his or her mind in a three-week period. However, the trial court's findings state that Daughtrey, in particular, was easily led and influenced in her views, and that this observation of the trial court agreed with Daughtrey's assessment by Dr. Bianco. Further, the trial court observed that Baker & Wyers' communications concerning events such as the Berrys' appearance at court was through the Berryhills. The evidence was conflicting whether the Berryhills were present when Baker and Wyers were communicating with the Berrys. Baker testified they were not present. Daughtrey testified they were present, and the record shows that they were present when the retainers were paid.

¶56 Baker and Wyers also represented David Berry in a proceeding he commenced in the District Court of Tulsa County. David's application was signed by Baker. O.R. at 156, 168. The application sought to vacate an amendment to Foster Berrys' trust, and for a restraining order against the guardian, the Berry's daughter, the firm of Riseling and Rhodes, the Berrys' financial advisor of eighteen years, and the Edward Jones Trust Company. The application sought an order restraining the defendants named therein "from any involvement in the financial planning of Grantor [Foster Berry] or have any contact with any person involved in the care of the Grantor." O.R. at 165. The application sought an order restraining the defendants "from any action affecting the maintenance or administration of [Foster's trust]". O.R. at 167. In addition, while the title of the application states that it seeks for an adjudication that Foster Berry is not incapacitated, the specific requests for relief ask for an order that the "Second Amended Trust be suspended pending a determination of the capacity of Grantor [Foster] at the time of signing...." O.R. at 164.[32] The appellate record shows that three months after the application was filed, attorneys Baker and Wyers appeared for David Berry at hearing on the Guardian's motion to dismiss David's application.[33]

¶57 A separate proceeding was instituted by David concerning Daughtrey's trust. O.R. at 218. The application lists Baker as counsel but it is not signed by Baker. The docket entry for this proceeding shows a similar entry for Baker and Wyers attending the hearing on the motion to dismiss on behalf of David.[34] The applications in both proceedings argue that the Berrys' trusts had historically made provisions for disbursements to their children and grandchildren; but the Second Amendment to them changed the timing for disbursements to their son and grandchildren and changed the daughter's share to an immediate disbursement. The Second Amendment also allegedly changed the corporate trustee. David alleged that the Second Amendment to the trusts was created by "the apparent conspiracy of Care [Steve Care, stockbroker and financial advisor to the Berrys], Peggy [Berrys' daughter, Peggy Jan Harris], and the law firm [Riseling and Rhodes] in drafting a Second Amendment which Grantor would never knowingly agree to." O.R. at 165. He alleged that "On August 17, 2011, Care appeared at the home of the Grantor with Jeff K. Rhodes (hereinafter 'Rhodes'), requesting Grantor to sign some new documents to make minor modifications to his [Foster's] Trust, execute a new Durable Power of Attorney and Nomination of Guardian, and possibly other documents including new Wills." O.R. at 159. He claimed that these actions were improper. David claimed he had a financial interest in his parents' trusts and that his sister should not receive her share in the manner specified in the Second Amendment.

¶58 Both applications filed by David challenging the amendments to the two trusts state that they are filed on behalf of himself and the Grantors of each of the trusts, Foster and Daughtrey. The applications by David do not specify in what legal capacity he is acting on behalf of his parents.

¶59 The appellate record contains an Entry of Appearance filed by David in his parents' guardianship proceeding. The entry is filed a month after he filed his two proceedings challenging the trusts and 2 months prior to the date that the trial court dismissed his actions. The entry of appearance is signed by Baker and states "by and through his legal counsel Clifton Baker and Steven Wyers, attorney at law, . . . Movant requests that all further and future correspondence or pleadings be directed to his attention through counsel at the address or telephone number listed below." O.R. at 281. The address and telephone of Baker and Wyers are listed on the appearance.

¶60 In the joint brief filed by both nominated counsel and counsel for the Berryhills in this Court, instead of focusing on the findings of the trial court used to show a conflict and a lack of independence, their legal argument is simply that the Berrys had capacity to make a knowing choice and that "Further, there was no evidence of any conflict of interest between the nominated attorneys and the Berrys."[35]

¶61 We reverse a guardianship order only if it is clearly against the weight of the evidence or contrary to law.[36] Generally, a conflict arises when a lawyer purports to represent two clients when a legal interest of one is contra to the other in the same litigation or other proceeding before the tribunal.[37] The filings in the District Court record and the testimony are sufficient to show that Baker and Wyers represented interests contrary to the Wards. A conflict of interest and a lack of independence is shown by Baker and Wyers accepting a retainer from the Berryhills and directing an additional payment to themselves from the Berrys' funds via the Berryhills without first obtaining permission from the court and simultaneously representing the Berryhills while they were seeking to obtain a guardianship over the Berrys just three weeks after agreeing to represent the Berrys and challenge that guardianship, and communicating with the Berrys as clients through the Berryhills. The trial court testimony is sufficient to affirm the trial court's order that the Berryhills were present in meetings when Baker and Wyers gave legal advice to the Berrys and concluded that Daughtrey relied on others for what she should say and do, including Baker and the Berryhills. Baker and Wyers also represented David in challenges to his parents' trusts while also purportedly representing his parents in the guardianship. Baker testified that he could not represent the Berrys in matters concerning estate planning, but he and Wyers represented David in two legal proceedings challenging the Berrys' trusts while simultaneously representing the Berrys in the guardianship proceeding.

¶62 That portion of the order of the District Court which removed retained counsel, Clifton Baker and Steven C. Wyers, as counsel for Foster and Daughtrey for a lack of independence and for a conflict of interest is affirmed.

IV. Remaining Claims in Nos. 111,492 and 111,961.

¶63 In Okla. Sup. Court No. 111,961 the Berryhills brought an original action seeking "emergency relief" by mandamus to compel (1) the guardian "to submit a proper report and accounting;" (2) the trial court to hold "a proper guardianship hearing;" and (3) the trial court to remove guardian Mansfield, and to dismiss the agent of guardian Mansfield, and to remove its protective order which restricted access to the Berrys by their relatives. The request for "emergency relief" was filed in this Court in July 2013 complaining of Judge Glassco's order filed in September 2011, and certain conditions of the guardianship that allegedly resulted from this order and subsequent proceedings in the trial court.

¶64 In Okla. Sup. Court No. 111,492, the Berryhills and nominated counsel jointly objected to restrictions imposed by the trial court's order with respect to visitations from family, and argue that the guardian improperly delegated powers of a guardian to the health care manager, and that the health care manager impermissibly profited from her initial mental assessment of the Berrys. The trial court held a hearing on the Berryhills' claim of being denied visitation and contact, and David Berry was one of the witnesses at this hearing. In the interest of judicial economy we combine the visitation/contact claims in No. 111,492 with those in No. 111,961, and assume original jurisdiction on these claims to the extent specified herein.

¶65 On the claim that the guardian had impermissibly shifted responsibility of making decisions to his agent, the healthcare manager for the Berrys, Susan Boyd, her testimony was that she notified the guardian concerning all visitation requests and she did not make any decisions on her own concerning the Berrys. She did testify that she employed others to provide healthcare for the Berrys.

¶66 There is no doubt that Boyd described herself as "agent for the guardian,"[38] and the Berryhills argue that this improper agency is demonstrated by a letter Mansfield provided to Boyd.[39] The letter states that the nursing service identified therein has authority to obtain information concerning the Berrys and that the management company (Susan Boyd and her employees) has full authority to be in the home of the Berrys, confer with treating therapists, treating physicians and staff members pertaining to the diagnosis, prognosis, and treating program for the Berrys. The letter also states that anyone may communicate to the guardian "any and all issues pertaining to the Berrys" through Select Life Management [Susan's Boyd's company]. The letter ends with "Select Life Management has the authority to do every act that I can as Guardian." While the Berryhills' principal complaint against Boyd is that she "made it increasingly hard to understand the hierarchy of this guardian-agent-healthcare worker(s) web, making it virtually impossible for Appellants to obtain permission to visit with the Wards,"[40] and we agree that a guardian may not unilaterally transfer or assign the guardian's powers and responsibilities to another,[41] there is no evidence before us of Boyd using the letter in exercising a guardianship power. The issue whether Mansfield could have provided a letter with more restrictive language for Select Life Management to use when providing nursing and health services and obtaining medical records is not before us. The evidence is sufficient to show that the trial court did not abuse its discretion in declining to remove Select Life Management.

¶67 The argument that Select Life Management improperly profited from Boyd's initial assessment is not well developed and contains no authority.[42] The Berryhills and nominated counsel claim that someone who performs a mental evaluation on another should not profit from that evaluation by being hired to care for that person as a result of the examination; in sum, that Boyd and her company should not be selected to provide care to the Berrys since Boyd performed the initial evaluation. As we have previously observed, Dr. Bianco did not base his opinion concerning the Berrys on the preliminary evaluation performed by Boyd, and the record before us does not show how Boyd has a conflicting interest now that the Berrys have received an independent evaluation.[43] The original proceedings herein were all brought after Dr. Bianco's assessment. We do not find an abuse of discretion on the part of the trial judge in declining to remove Boyd after Dr. Bianco's assessment.[44] We must observe that three weeks after the creation of the special guardianship both the Berryhills and nominated counsel were seeking to impose a guardianship on the Berrys which included supplying the Berrys with nursing care. We conclude that this argument by the Berryhills and nominated counsel in this case is without merit.

¶68 The trial court held a hearing six days after the Berryhills filed their motion in the trial court to vacate the guardian's report, to lift the visitation and telephone restrictions, and remove the guardian and the guardian's agent. David Berry, James Berryhill, and Susan Boyd, the health care manager and agent for the guardian testified. The trial court granted the Berryhills' motion to vacate the annual report and accounting. Because the trial court vacated its order approving the guardian's accounting, a review of that portion of the order and the accounting itself is not properly before us in No. 111,961 for extraordinary writ review.[45]

¶69 David Berry testified he must contact his parents' health care manager, or "agent for Guardian," Susan Boyd, when he wants to visit his parents. He testified that she checks with the guardian, Mansfield, "to make certain that I can get a visitation in." He stated he is allowed to visit "[n]ormally anytime I've contacted the agent of the guardian, Susan Boyd." He also testified his visits are supervised and he is limited to two hours. He stated health care workers are present and that they take notes of his visit. He testified he is not allowed to take his parents outside the home, and he is not allowed to spend a night in the home. He testified he heard a "click"upon conclusion of his telephone calls to his parents and concluded they were being heard and monitored by the caregivers. He also testified he made phone calls to his parents when he could have sounded inebriated. The Guardian stipulated that David Berry's "input is not taken into account when considering a plan for care of the wards." Tr. June 24, at 12.

¶70 James Berryhill testified that when he wanted to visit the Berrys he has to go through his counsel who then notifies either Susan Boyd or the guardian. He testified his visits are restricted to either 8 or 9 AM to 5 PM, Monday through Friday. He testified his visits are restricted to an one and 1/2 hours, except for twice he was allowed a two-hour visit. He testified he is not allowed to telephone the Berrys except when permission has been granted by the guardian or the agent for the guardian. He testified Daughtrey called him twice. He also testified Daughtrey told him that she was able to call him after a healthcare worker had left the cordless phone with her after she finished a call with David or with her brother. He also stated he was denied an opportunity to take the Berrys to dinner. The guardian stipulated there was no agreement with the Berryhills for them to have less restrictive visitations with the Berrys.

¶71 The guardian stated that Mr. Berryhill is permitted to telephone the Berrys. The guardian then stated the following.

If they [the Berrys] are asleep, they are not going to be woken up. If they don't want to talk to him, despite whet he thinks, they're not going to be disturbed to talk to him. If he [Foster] can't hear what Mr. Berryhill is saying on the phone, he being Foster, when he's listening to Mr. Berryhill talk and decides to hand the phone over to a healthcare worker, then they're not going to make him [Foster] take the phone back up.

Tr. at 31.

James Berryhill then stated "That isn't the situation." He then testified that his telephone calls are being blocked and that it was "not emotionally healthy" for the Berrys because he has been in close communication with them for over 50 years.

¶72 Susan Boyd testified. She testified she oversees the Berrys' health. She attends all of their appointments with doctors. In a previous hearing she testified she is an R. N. and a member of, and certified by, the National Association of Professional Geriatric Care Managers.[46] In the hearing on the Berryhills' emergency motion she testified she instructed the healthcare workers to follow the guardian's direction concerning telephone calls. "That they [the Berrys] are allowed to speak with the Berryhills any time they would like. They can call at their discretion, and if they want to talk to them, they can." Tr. at 37. She testified she does call the guardian and arrange for visitation with the Berrys. Then counsel for the Berryhills appears to have made an argument that "around the clock" healthcare workers would create an impermissible restriction on James Berryhill's and David Berry's desire to spend the night at the Berrys' residence and visit with the Berrys. Tr. at 38-39.

¶73 Boyd testified David Berry's phone calls and visitations have not been restricted. She testified that the Berrys may telephone whoever they want whenever they wish. Tr. at 40. She testified the Berryhills have contacted her concerning many visitations and that they had cancelled approximately 35-40% of the visitations. She testified that when the Berryhills email her concerning a visit she confirms there is a supervisor available, lets the guardian know of the request for a visit, and then the guardian confirms the request. The supervisor who is present is a nurse. She testified the director of nursing at Senior Select, a nursing agency, decided that a supervising nurse was necessary during visits from the Berryhills because visits by the Berryhills had "agitated the Wards" when the Berryhills would discuss the topics of the guardianship, other relatives, and money. Tr. at 47 - 48. She testified the nurse sent by the nursing agency for the Berryhills' visits is one who is more experienced in handling conflict situations. Tr. at 51. She testified the nursing agency sent the nurses with permission of the guardian.

¶74 Counsel for the Berryhills then made an offer of proof for portions of a deposition he desired to enter into evidence. The deposition of the healthcare worker is that there is no "healthcare plan in place . . . no cognitive plan in place" for the Berrys that the healthcare worker was aware of. Counsel for the Berryhills then rested. Counsel argued that supervised visitation was not proper and "we ask the court to recognize that this constitutes an emergency and that some further direction be given to establish that Mr. Berryhill - that the Berrys are entitled not to have a healthcare worker taking notes of all their conversations and listening to their personal conversations with their loved ones. . . . [and] there's no need for an additional nurse supervisor to be there." Opposing counsel argued that the procedures in place were to protect the Berrys.

¶75 The court then explained:

It is not my intention to curtail the Berrys unreasonably. It is my every intention to make sure that they have a peaceful, happy life, and that they are permitted to have serenity, that they are permitted to call whomever they choose, that they are permitted to visit, certainly, with their son as they choose to do so. I do think that if Mr. Berry has called - and I'm speaking of David Berry - if he has called when he's inebriated, it is appropriate for the call to be curtailed. Does that mean every time he calls? Absolutely not. I think it would likely be upsetting to his parents if they felt he was inebriated. They discussed some of that when we had our trial, or at least in the initial guardianship hearing that we had a long time ago.

I haven't heard from the Senior Select director to know what precipitated the determination to be made for supervisors to be present other than what has been reported by Ms. Boyd as violations of the Judicial Order of Proper Conduct with regard to certain topics, I have not forgotten that the Berryhills removed a significant amount of money from a personal account belonging to the Berrys and placed it in her name, Anita Berryhill's name.

. . . I think that is an appropriate restriction and I think it is an appropriate restriction to make sure the Wards are not being agitated. And it does concern me that the report is that every time there has been a visit with Mr. Berryhill - I don't know whether Mrs. Berryhill has also been present at the same time - that it has resulted in agitation to the Berrys.

. . . I have not heard that there are restrictions on David Berry's access to his parents or theirs to him. I have not heard that there are restrictions with regard to the Berryhills' phone calls or their calls to the Berryhills other than when there have been reported times when the phone has had some difficulty, which I believe was in the annual report that there had been some difficulty because of the age of the home with the wiring for the telephone. . . .

June 24, 2013, Tr. at 59 - 61 (material omitted).

The trial judge also stated that she would not create a schedule to force the Berrys to telephone the Berryhills because the Berrys "should be permitted to choose whom they wish to call, whom they wish to see, whom they wish to visit with, and their wishes should be honored." Tr. at 61-62. The trial judge then stated that she was vacating the order which approved the guardian's accounting because an objection had been filed and a hearing on the objection had been scheduled.

¶76 The trial court ruled that the Berrys "should be permitted to choose whom they wish to call, whom they wish to see, whom they wish to visit with, and their wishes should be honored." The testimony was that the supervising nurse present during the visits from James Berryhill was there because of a medical decision based upon agitation routinely caused by the visits. There was no testimony to the contrary offered by the Berryhills. Indeed, it appears that the testimony at the hearing was newly-revealed information to the Berryhills that the decision for the presence of a supervising nurse had originated from the nursing service in response to the Berrys' agitation instead of a directive originally from the guardian or Boyd. The Berryhills offered no testimony from any healthcare worker in the Berrys' home that they had been directed by the guardian or Boyd to shield the Berrys from all phone calls to them from the Berryhills.[47]

¶77 When prohibition or mandamus is used in those limited circumstances to control a trial court's exercise of discretion, the petitioner must show that the trial court exceeded its authority or discretion in the order that the party is challenging by an extraordinary writ.[48] The two orders challenged in this proceeding, the Holley adjudication of January 18, 2013, and the order on the emergency motion, June 28, 2013, contain no restriction on the wards' rights concerning telephone calls; they are specifically allowed to telephone whomever they desire and take phone calls, when awake, from whomever they desire. The trial judge, recognizing the medical necessity for the wards to be able to rest undisturbed, and their right to refuse to talk to anyone who telephoned them, declined to require the Berrys to make telephone calls or take calls from others.

¶78 The supervised visitation of the Berryhills appears to have been created from medical necessity to combat agitation caused from their visitations and the previous contact between the Berrys and the Berryhills which resulted in the Berrys' funds being placed in Anita Berryhill's bank account. The trial court specifically mentioned the absence of testimony before her from members of the nursing staff who observed the agitation and the amelioration of that agitation by a supervising nurse when the Berryhills visited. She did have testimony from Boyd who received reports from the nursing service and the need for the presence of a supervising nurse during the Berryhills' visits. Again, we find no abuse of discretion on the part of the trial court in adjudicating the Berryhills' emergency motion that would warrant extraordinary relief by mandamus or prohibition.

¶79 The Berryhills and nominated counsel argue that the protective order issued by Judge Otey should be set aside and the Berryhills be allowed to visit unsupervised. Judge Otey stated that her order was temporary to maintain the status quo until Judge Bitting could hear the matter. The restrictions on the visits by the Berryhills are present because of Judge Otey's order, but as a result of Judge Bitting's decision after hearing testimony. We decline to change the trial court's restrictions on the Berryhills' visits based upon their claims that the evidence was insufficient before Judge Otey for imposition of restrictions on visitation.

¶80 The Berryhills' claim to be named guardians is not before us in this proceeding. The nominations by Foster and Daughtrey were dated on October 21, 2011, and the nominations were attached to the petition filed in the District Court that same date by the Berryhills seeking a guardianship with Baker and Wyers as counsel for the Berryhills. The trial court record appears[49] to show that parties agreed to an independent guardian being named, and Mansfield was named pursuant to that agreement. At a subsequent hearing, counsel for the Berryhills argued that the agreement for an independent guardian was only until the mental evaluations were completed. However, that was not how the trial judge remembered the proceeding resulting in Mansfield's appointment as guardian.

¶81 At the hearing of May 30, 2012, counsel for James and Anita Berryhill argued that a Holley hearing on nominated counsel should not be held because "we have no findings of incapacity" as to the Berrys. Tr. at 8. One counsel formerly representing the Berryhills stated that he did not "sign off" on the order appointing a general guardian and that the Berryhills' petition to be named guardians remained pending. The trial judge then informed counsel that at a previous hearing she had heard testimony and made an appointment of a general guardian based upon that testimony. She informed counsel that "if you do not like the determination that was made, of course, you have a right to appeal." Id. at 9. The trial judge and various counsel then had a discussion of what they remembered, specifically what they remembered concerning whether the petitions for guardianship by Jan and the Berryhills remained pending for future consideration after the appointment of Mansfield. The trial court then stated:

Okay. All right. Well, if you all have motions that you would like to file properly bringing those issues before the Court, you may do so. We are not here on those issues today.

May 30, 2012, Tr. at 21.

The trial court instructed the parties to file a motion bringing their claims of pending petitions for guardianship before the judicial cognizance of the trial court to adjudicate. The clerk's docket shows an entry for a petition to remove guardian and for appointment of successor co-guardians filed on July 9, 2012, with an amended petition filed July 11, 2012. An answer was filed July 30, 2012, and a reply on August 17, 2012.[50] Several hearings were held on the Holley issue and complaints by the Berryhills concerning the limits imposed on their visits with the Berrys. The trial court's decision on the Holley issue and the then pending requests for emergency relief was filed in January 2013. In June 2013, the Berryhills requested that Mansfield be removed as guardian but did not combine their claims relating to a pending petition for guardianship.

¶82 In their briefs filed in this Court in No. 111,492,[51] the Berryhills and nominated counsel make no statements or argument concerning the petition and amended petition of July 2012 for a change in guardianship status. The briefs in No. 111,492, do not state that the trial court has declined to rule on the issue or to set a hearing on the issue. In the brief filed by the Berryhills and nominated counsel in No. 111,961, they assert that the guardian should be removed because he has not performed his duties faithfully.[52] They do not refer to their petition and amended petition filed in 2012, any decision on that amended petition, any refusal by the trial court to act on that petition, or that counsel has made any effort to have the petition adjudicated. However, in No. 111,492 we are requested to remove the agent of the guardian as well as the guardian.[53] The arguments in their brief state that Mansfield improperly delegated authority to Boyd, and that Boyd improperly obtained a profit from her initial determination that the wards were incapacitated.[54] Whether the Berryhills' claim for guardianship was adjudicated, or waived, or remains pending in the trial court cannot be determined on the record before us and we decline to examine it in the context of the present appeal and requests for extraordinary relief.

¶83 Nominated counsel and the Berryhills argue that the evidence of the Berrys' mental capacities was absent or insufficient to authorize either a special guardianship in September 2011, or the subsequent order appointing a general guardian in October 2011 (filed Nov. 3, 2011).[55] The first application to assume original jurisdiction herein was filed approximately 15 months after the order appointing a general guardian.[56] A trial court's order is appealable when it determines that an individual is incapacitated and appoints a general guardian. 30 O.S.2011 § 3-106. In 1978, we held that an order which overrules a motion to vacate a previous order adjudicating the need for a guardianship is also an appealable order.[57] There is nothing in the record before us which suggests that nominated counsel and the Berryhills either timely appealed the order appointing a general guardian or subsequently filed in the trial court a motion to vacate the order appointing the general guardian.

¶84 As noted herein, the trial judge stated that she heard from Daughtrey at the hearing which resulted in the appointment of a general guardian. This challenge by nominated attorneys and the Berryhills appears to raise the general issues of (1) the required nature of evidence necessary at a hearing that adjudicates incapacity and appoints either a special or general guardian, (2) whether the nature of this evidence is in any way dependent upon the nature of the incapacity which is alleged, and (3) whether the evidence must be preserved in the trial court record by, for example, a transcript with exhibits, even if no party requested[58] a stenographic record. For example, their challenge argues that no evidence was presented sufficient to appoint a general guardian and the journal entry signed by the judge states that appointment of a guardian was based upon testimony from Daughtrey. Their challenge also raises the specific issue whether the assessment by Dr. Bianco was proper.

¶85 Again, at a hearing held in May of 2012, the trial judge, on the record, specifically requested that the parties file motions raising whatever issues counsel believed remained pending and needed an adjudication. Absent exigent and unusual circumstances, in the context of an original supervisory writ this Court does not make first-instance assessments in applying legal principles to facts, but allows the parties to develop issues of fact and law in the trial court.[59] Between June of 2012 and February 2013 when the proceeding was filed in this Court, nominated counsel and the Berryhills made litigation decisions with respect to what claims they would present by motion in the trial court. Generally, if a lawyer (1) fails to file an appeal of an appealable order, and (2) then fails to file a motion to vacate challenging that order, and (3) continues to actively litigate other issues in the trial court for several months, and then (4) upon filing an extraordinary writ proceeding in this Court raises an issue which should have been the subject of a prior appeal or motion to vacate, then the lack of an apparent need for a quick adjudication in the trial court as shown by counsel's litigation strategy in that court will be one factor considered as showing a lack of an exigent need to address a first-instance adjudication in this Court. We decline to address this claim prior to an adjudication of the claim in the trial court.

V. Okla. Sup. Ct. No. 112,573

¶86 In No. 112,753, the Berryhills and David Berry seek an extraordinary writ to review an order of the trial court which quashed their subpoenas duces tecum that were issued to "various banking and financial institutions, including subpoenas related to the Ward's trust accounts."[60] The trial court's order stated that it did not have jurisdiction and relied upon our recent opinion in Russell v. Chase Inv. Servs. Corp., 2009 OK 22, 212 P.3d 1178. We assume original jurisdiction pursuant to Okla. Const. Art. 7 § 4, to clarify the issue. We grant prohibition to prevent enforcement of the trial court's order quashing the subpoenas, and explaining that the subpoenas should not be enforced until the trial court holds a hearing on the motion to quash that adjudicates the issues raised by the motion.

¶87 In Russell, we explained that the guardianship statutes must be construed to accommodate a durable power of attorney, and a guardianship does not automatically terminate a durable power of attorney.[61] We noted that a durable power of attorney may be revoked by a court-appointed fiduciary and, if not revoked, a durable power of attorney may exist "within a general guardianship."[62] We also explained that "there is nothing in the Guardianship Act which prevents the guardian from utilizing the attorney-in-fact, who is accountable to the guardian for her actions, in carrying out the guardian's duties. . . . [and the relevant statutes] 'allow the attorney-in-fact to continue to manage the principal's financial affairs, while the court-appointed fiduciary would take the place of the principal in overseeing the actions of the attorney-in-fact.'"[63] A guardian exercises power over a person exercising a durable power of attorney as we explained in Russell:

A year after the guardian's appointment, every year thereafter, and upon court order, the guardian of the property is required by statute to file a report, which shall contain a complete financial statement of the ward's financial resources over which the guardian has control or supervision and "an accounting of any receipts and disbursements received, or expenditures made" on the ward's behalf. 30 O.S.2001, §§ 4-303(A), 4-306(E). Since the attorney-in-fact is accountable to the guardian, and all of the ward's property is a part of a general guardianship of the property over which the guardian has control or supervision, the annual report will reflect transactions involving the ward's property made by the attorney-in-fact, as well as the guardian. See id. § 4-306(E). The court exercises its jurisdiction to determine "how the estate of the ward shall be managed, expended, or distributed" not by issuing specific orders for day-to-day expenditures but by exercising control through its approval or disapproval the guardian's reports. See id. § 1-114.

Russell, 2009 OK 22, ¶ 18, 212 P.3d at 1184 (note omitted).

By statute, a report of the guardian "shall contain a complete financial statement of the financial resources of the ward under the control and supervision of the guardian or limited guardian . . . [and] shall contain an accounting of any receipts and disbursements received, or expenditures made by the guardian . . . on behalf of the ward." 30 O.S.2011 § 4-306(E)(1) and (2) (material omitted). A guardianship court exercises jurisdiction over the attorney-in-fact by a guardian submitting the required financial information and this financial information includes expenditures made by an attorney-in-fact under the guardian's supervision.

¶88 The Berryhills and David Berry assert that the guardian has not filed the required financial information and no report has been filed showing any expenditures from Daughtrey's trust, although all of her living expenses are to be paid from the trust. The confidentiality of every trust provision is not negated by a guardian's duty to file a financial report. However, a guardian may not decline to account for expenditures made on behalf of the ward by a trustee. Both the financial resources of the ward and expenses of the ward must be reported in a guardian's report. 30 O.S.2011 § 4-306(E)(1) & (2).

¶89 Discovery promotes the ascertainment of the truth and ultimate disposition of a legal proceeding,[64] but the right to discovery occurs in the context of orderly procedure within the framework of litigable interests. When a proper party in a guardianship alleges that a guardian has failed to file an accounting of financial resources and expenditures as required by statute, that party is entitled to discovery to have an opportunity to be heard in a meaningful manner.[65] Generally, a "party" to a guardianship means "the person or entity filing the petition, application, motion, acceptance of a testamentary nomination, or objection; the subject of a guardianship proceeding; and the guardian, the guardian ad litem and the conservator, if any such persons have been appointed; . . . ." 30 O.S.2011 § 1-111(23). Party status, as such relates to a guardian's report, also includes those who are statutorily specified to receive that report. Copies of a guardian's report on an adult ward are served on the ward, spouse of the ward, adult children of the ward, and others designated by the court.[66] These parties may file an objection to a Guardian's report.[67] A guardianship court possesses jurisdiction to issue a subpoena duces tecum to a trustee of a ward expending funds on behalf of that ward when those expenditures are statutorily required to be in a guardian's report.

¶90 The record before us shows an objection to certain individuals having access to financial information from the ward's trust. Parties in a guardianship, including those who are given the statutory right to object to a guardian's report, have a right to engage in discovery to be afforded an opportunity for a full and fair adjudication of their objection to a guardian's report. Generally, we have explained that a party objecting to discovery must file an objection to the discovery and seek protection from the discovery request.[68] Upon a party filing an objection to discovery and asserting that certain individuals are not entitled to financial information of a ward, the trial court must adjudicate that objection and determine if the individuals are proper parties in the guardianship proceeding and if the objection to the discovery is a valid.

VI. Conclusion

¶91 We affirm that part of the trial court's order which held the nominated firm of Baker and Wyers to have a conflict and to be not independent. We assume original jurisdiction on the other claims, and decline to issue writs of mandamus and prohibition with the sole exception of the trial court quashing subpoenas.

¶92 We issue prohibition with directions to the trial court to hold a hearing on the motion to quash the subpoenas and determine whether the information is being sought by a proper party to the guardianship and whether an objection to discovery is proper pursuant to the Discovery Code or some other provision of law. We hold that a guardianship court possesses jurisdiction to issue a subpoena duces tecum to a trustee of a ward expending funds on behalf of that ward when those expenditures are statutorily required to be in a guardian's report, and those seeking the information are statutorily authorized to object to the guardian's report.

¶93 ALL JUSTICES CONCUR.

FOOTNOTES

[1] We have adjudicated cause Okla. Sup. Ct. No. 112,573, as part of the Court's Opinion that also adjudicates No. 111,492 which is consolidated with No. 111,961. Cause No. 111,492, is an appeal after the Court's recasting and the requests for issuance of writs in No. 111,961 were made part of that appeal by the consolidation of the proceedings by prior order of this Court. A mandate encompassing both No. 111,492 and 111,961 will issue in accordance with the Rules of this Court. By prior order of the Court, Cause No. 112,573, is a companion case and an exercise of original jurisdiction, and it is not part of the mandate in consolidated proceeding Nos. 111,492,/111,961. One consequence of this procedure is that the Court's opinion as to No. 112,573 may be enforced when filed with the Clerk of this Court and the consolidated appellate proceeding may be enforced upon issuance of the mandate. See Okla. Sup. Ct. R. 1.16, 1.193; Chronic Pain Associates, Inc. v. Bubenik, 1994 OK 127, 885 P.2d 1358, 1364 ("In all original proceedings, other than those to review a decision of the Workers' Compensation Court or to impose bar discipline, the decision of this Court shall become effective when the opinion or order is filed with the Clerk of this Court, unless this Court stays the effective date."); Daniel v. Daniel, 2001 OK 117, ¶ 12, 42 P.3d 863, 868-869 ("The mandate from the Supreme Court is an order requiring the lower tribunal to comply with an appellate opinion, and it carries with it the authority for the trial court to proceed.").

[2] According to a Suggestion of Death filed in this Court, Foster Calvin Barry died during the pendency of this proceeding.

[3] Judge Millie Otey ordered that the estate planning documents including powers of attorney, trust documents, and wills submitted to the court be under seal, Oct. 11, 2011.

[4] Both the singular "trust" and plural "trusts" are used throughout this opinion because the parties at times would refer to the separate trust for Foster and the separate trust for Daughtrey as "the trust" when referring to both, and at various times the parties distinguish between the two trusts and refer to them separately. The opinion follows their lead and distinguishes them when the parties have appeared to make the distinction.

[5] The written form of the decision recorded with the trial court clerk also involves a jurisdictional requirement for commencing an appeal. For example, appealability based upon the form of an order may be found at 12 O.S.2011 § 696.2 (D): "... The filing with the court clerk of a written judgment, decree or appealable order, prepared in conformance with Section 696.3 of this title and signed by the court, shall be a jurisdictional prerequiste to the commencement of an appeal." See also 12 O.S. 2011 § 990A(A) (stating a thirty-day jurisdictional requirement for commencing an appeal and referencing 12 O.S. §§ 696.2, 696.3).

[6] Conterez v. O'Donnell, 2002 OK 67, ¶ 11, 58 P.3d 759, 763.

[7] See 12 O.S.2011 § 952 (b)(1) at note 8 infra.

A final order is "An order affecting a substantial right in an action, when such order, in effect, determines the action and prevents a judgment, and an order affecting a substantial right, made in a special proceeding or upon a summary application in an action after judgment, is a final order, which may be vacated, modified or reversed, as provided in this article." 12 O.S.2011 § 953.

[8] 12 O.S.2011 § 952:

(a) The Supreme Court may reverse, vacate or modify judgments of the district court for errors appearing on the record, and in the reversal of such judgment may reverse, vacate or modify any intermediate order involving the merits of the action, or any portion thereof.

(b) The Supreme Court may reverse, vacate or modify any of the following orders of the district court, or a judge thereof:

1. A final order;

2. An order that discharges, vacates or modifies or refuses to vacate or modify a provisional remedy which affects the substantial rights of a party; or grants, refuses, vacates, modifies or refuses to vacate or modify an injunction; grants or refuses a new trial; or vacates or refuses to vacate a final judgment;

3. Any other order, which affects a substantial part of the merits of the controversy when the trial judge certifies that an immediate appeal may materially advance the ultimate termination of the litigation; provided, however, that the Supreme Court, in its discretion, may refuse to hear the appeal. If the Supreme Court assumes jurisdiction of the appeal, it shall indicate in its order whether the action in the trial court shall be stayed or shall continue.

The failure of a party to appeal from an order that is appealable under either subdivision 2 or 3 of subsection (b) of this section shall not preclude him from asserting error in the order after the judgment or final order is rendered.

[9] 12 O.S.2011 § 993 (as amended Laws 2013, 1st Ex.Sess., c. 10, §§ 2, 3 (eff.Sept.10, 2013.):

A. When an order:

1. Discharges, vacates, or modifies or refuses to discharge, vacate, or modify an attachment;

2. Denies a temporary or permanent injunction, grants a temporary or permanent injunction except where granted at an ex parte hearing, or discharges, vacates, or modifies or refuses to discharge, vacate, or modify a temporary or permanent injunction;

3. Discharges, vacates, or modifies or refuses to discharge, vacate, or modify a provisional remedy which affects the substantial rights of a party;

4. Appoints a receiver except where the receiver was appointed at an ex parte hearing, refuses to appoint a receiver, or vacates or refuses to vacate the appointment of a receiver;

5. Directs the payment of money pendente lite except where granted at an ex parte hearing, refuses to direct the payment of money pendente lite, or vacates or refuses to vacate an order directing the payment of money pendente lite;

6. Certifies or refuses to certify an action to be maintained as a class action;

7. Denies a motion in a class action asserting lack of jurisdiction because an agency of this state has exclusive or primary jurisdiction of the action or a part of the action, or asserting that a party has failed to exhaust administrative remedies, but only if the class is subsequently certified and only as part of the appeal of the order certifying the class action; or

8. Grants a new trial or opens or vacates a judgment or order, the party aggrieved thereby may appeal the order to the Supreme Court without awaiting the final determination in said cause, by filing the petition in error and the record on appeal with the Supreme Court within thirty (30) days after the order prepared in conformance with Section 696.3 of this title, is filed with the court clerk. If the appellant did not prepare the order, and Section 696.2 of this title required a copy of the order to be mailed to the appellant, and the court records do not reflect the mailing of a copy of the order to the appellant within three (3) days, exclusive of weekends and holidays, after the filing of the order, the petition in error may be filed within thirty (30) days after the earliest date on which the court records show that a copy of the order was mailed to the appellant. The Supreme Court may extend the time for filing the record upon good cause shown.

B. If the order discharges or modifies an attachment or temporary injunction and it becomes operative, the undertaking given upon the allowance of an attachment or temporary injunction shall stay the enforcement of said order and remain in full force until final order of discharge shall take effect.

C. If a receiver shall be or has been appointed, upon the appellant filing an appeal bond, with sufficient sureties, in such sum as may have been required of the receiver by the court or a judge thereof, conditioned for the due prosecution of the appeal and the payment of all costs or damages that may accrue to the state or any officer or person by reason thereof, the authority of the receiver shall be suspended until the final determination of the appeal, and if the receiver has taken possession of any property, real or personal, it shall be returned and surrendered to the appellant upon the filing and approval of the bonds.

[10] See 12 O.S.2011 § 952, supra, at n. 8.

[11] See 12 O.S.2011 § 952(a) ("The Supreme Court may reverse, vacate or modify judgments of the district court for errors appearing on the record, and in the reversal of such judgment may reverse, vacate or modify any intermediate order involving the merits of the action, or any portion thereof.") (emphasis added); State v. One Thousand Two Hundred Sixty-seven Dollars, 2006 OK 15, ¶ 17, 131 P.3d 116, 123 ("An aggrieved party may secure review of every preserved prejudicial error committed at nisi prius in the course of proceedings which precede an appealable decision. This common-law concept of reviewability is explicitly embodied in the terms of 12 O.S.2001 § 952(a).") (notes omitted).

[12] 30 O.S.2011 § 3-106 (A)(6):

"A. In all hearings conducted pursuant to Article III of the Oklahoma Guardianship and Conservatorship Act, an individual who is alleged to be or found to be an incapacitated or partially incapacitated person shall have a right to: . . . 6. appeal adverse orders and judgments as provided by the rules of civil procedure;. . . ."

[13] 58 O.S.2011 § 721:

An appeal may be taken from the following judgments or orders of the district court:

1. Granting, or refusing, or revoking letters testamentary or of administration, or of guardianship, or conservatorship;
2. Admitting, or refusing to admit, a will to probate;
3. Against or in favor of the validity of a will or revoking the probate thereof;
4. Against or in favor of setting apart property, or making an allowance for a widow or child;
5. Against or in favor of directing the partition, sale or conveyance of real property;
6. Settling an account of an executor, or administrator or guardian;
7. Refusing, allowing or directing the distribution or partition of an estate, or any part thereof or the payment of a debt, claim, legacy or distributive share;
8. Refusing or allowing the release of estate tax liability;
9. An order determining liability for estate taxes made pursuant to Section 268 of this title; or
10. From any other judgment, decree or order of the court in a probate cause, or of the judge thereof, affecting a substantial right.

[14] County Courts exercised "probate jurisdiction" or jurisdiction in "probate matters" prior to the reorganization of Oklahoma courts in 1969. In re Guardianship of Stanfield, 2012 OK 8, 276 P.3d 989, 998; Wilson v. Kane, 1993 OK 65, 852 P.2d 717, 720-721. The phrase "probate cause" was often linked to the specific case number on the docket of a county court exercising its probate jurisdiction in a guardianship. Harrison v. Orwig, 1931 OK 244, 299 P. 143, 146; Steil v. Marshall, 1928 OK 321, 267 P.2d 268, 268-269. Cf. Reynolds v. Brock, 1926 OK 3, 250 P. 999, 1000 (when adjudicating the issue whether a guardianship could be transferred between two county courts and after discussing the jurisdiction of county courts in "probate matters," the Court explained that on county court had not acquired jurisdiction "of this probate proceeding"). The probate jurisdiction exercised in a probate cause in a county court statutorily included a guardianship proceeding which became part of the probate jurisdiction of a district court. See, e.g., 58 O.S.1961 § 1 (2); 58 O.S.2011 § 1 (A) (2).

[15] 1938 OK 424, 81 P.2d 488.

[16] Towne, 1999 OK 10, at ¶ 3; State ex rel. Reirdon, 81 P.2d at 490-491.

[17] Towne, 1999 OK 10, at ¶ 4, ("the January 5, 1999 guardianship order . . . constitutes an appealable interlocutory guardianship decision"); Towne v. Hubbard, 2000 OK 30, ¶ 0, 3 P.3d 154, 156 ("This court recast the quest for a prerogative writ into a timely appeal from an interlocutory order in guardianship.").

[18] In the Matter of the Guardianship of Holly, 2007 OK 53, ¶¶ 16, 20-23, 164 P.3d 137, 143-144. See also Towne v. Hubbard, 2000 OK 30 ¶ 11, 3 P.3d 154, 158 ("This court recast the quest for a prerogative writ into a timely appeal from an interlocutory order in guardianship and sua sponte retained the cause for disposition.").

[19] The thirtieth day was Sunday, February 17, 2013, which was followed on February 18, 2013, Presidents' Day, a legal holiday. 25 O.S.2011 § 82.1(A). The timely filing of a petition in error on a Sunday or on one of the specific holidays listed in § 82.1(A) may be performed on the next succeeding business day. See 25 O.S. § 82.1(C) ("Any act authorized, required, or permitted to be performed on a holiday as designated in subsection A of this section may be performed on the next succeeding business day, and no liability or loss of rights of any kind shall result from such delay.").

See 12 O.S.2011 § 990A(A) which states in part that: "A. An appeal to the Supreme Court of Oklahoma, if taken, must be commenced by filing a petition in error with the Clerk of the Supreme Court of Oklahoma within thirty (30) days from the date a judgment, decree, or appealable order prepared in conformance with Section 696.3 of this title is filed with the clerk of the trial court."

[20] 2002 OK 67, 58 P.3d 759.

[21] State v. One Thousand Two Hundred Sixty-seven Dollars, 2006 OK 15, ¶ 17, 131 P.3d 116, 123 ("An aggrieved party may secure review of every preserved prejudicial error committed at nisi prius in the course of proceedings which precede an appealable decision. This common-law concept of reviewability is explicitly embodied in the terms of 12 O.S.2001 § 952(a).") (notes omitted).

[22] Martin v. Johnson, 1998 OK 127, ¶ 18, 975 P.2d 889, 893-894 (An intermediate or interlocutory order anterior to judgment may be reviewed on appeal from the judgment.); LCR, Inc. v. Linwood Properties, 1996 OK 73, at n. 19, 918 P.2d 1388, 1393 ("Prejudgment orders, which affect other intermediate orders, may, of course, be reviewed after judgment under the standard of abused discretion."). Cf. Liberty Bank and Trust Co. v. Rogalin, 1996 OK 10, 912 P.2d 836, 839 (a party's right to seek appellate review of a judgment yet to be made, and those interlocutory adjudications preceding it, are not prejudiced by the Court's dismissal of a premature appeal for lack of an appealable judgment).

[23] Whig Syndicate, Inc. v. Keyes, 1992 OK 95, 836 P.2d 1283, 1285-1286.

[24] Whig Syndicate, 836 P.2d at 1286. See also Okla. Sup. Ct. R. 1.60 ("Orders of the district court that are interlocutory and may be appealed by right in compliance with the rules in this part are those that: ". . . (g) Certify or refuse to certify an action to be maintained as a class action . . . .").

[25] Whig Syndicate, 836 P.2d at 1286, 1289, emphasis added.

[26] In re Guardianship of Holly, 2007 OK 53, ¶ 22, 164 P.3d 137, 143, explaining In re Towne, 2000 OK 30, 3 P.3d 154.

[27] Miami Business Services, L.L.C. v. Davis, 2013 OK 20, ¶ 11, 299 P.3d 477, 483.

[28] Miami Business Services, L.L.C. v. Davis, 2013 OK 20, ¶ 12, 299 P.3d at 484.

[29] We have previously observed in the context of a guardianship proceeding that in addition to a party raising the issue of a lawyer's conflict and independence with his or her client "a statute directs the court to consider the matter." Towne, 2000 OK 30, ¶ 15, 3 P.3d at 161.

[30] 30 O.S.2011 § 4-403:

A. 1. An attorney, other than a public defender, for a ward or a subject of a proceeding pursuant to the Oklahoma Guardianship and Conservatorship Act or whose services are obtained by a guardian on behalf of a ward is entitled to reasonable compensation to be paid from and as a charge against the estate of the ward. Reasonable compensation for attorney services rendered and expenses made on behalf of the guardian of the ward incurred prior to the appointment of the guardian may be paid from and charged against the estate of the ward, as approved by the court prior to payment.

2. Guardians ad litem, other than an employee of a public agency or an employee of a private agency which provides such service pursuant to a contract with a public agency, appointed pursuant to the provisions of this act are entitled to reasonable compensation.

3. A person conducting an evaluation of the subject of the proceeding, whose services resulted in the appointment of a limited guardian or guardian or other order beneficial to the subject of the proceeding, is entitled to reasonable and necessary compensation.

B. 1. Compensation and reimbursements pursuant to this section shall be paid from the financial resources of the subject of the proceeding unless the court determines that such payment of compensation and reimbursements would:

a. substantially impede the partially incapacitated or incapacitated person from meeting the essential requirements for his physical health or safety, and
b. substantially impair the financial resources of such person, or substantially impede his ability to obtain the services necessary for developing or regaining his abilities to the maximum extent possible.

2. If not otherwise compensated or reimbursed pursuant to the provisions of paragraph 1 of this subsection:

a. any attorney or guardian ad litem appointed by the court who is entitled to compensation shall be compensated from the court fund of the court having jurisdiction,

b. the cost of services provided by a person conducting an evaluation, when such person is the employee of a public agency or the employee of a private agency which provides such services for guardianship proceedings pursuant to an agreement with a public agency, shall be borne by the public agency, or by the private agency in accordance with the terms of such agreement, and

c. if the person conducting an evaluation is a private individual or agency and the cost of the services provided is not otherwise compensable under a state or federal public assistance program, compensation for the cost of services shall be from the court fund of the court having jurisdiction.

3. Compensation or reimbursement from the court fund for attorneys and guardian ad litem pursuant to the provisions of this subsection shall be in accordance with the provisions of Section 1304 of Title 20 of the Oklahoma Statutes.

C. All compensation and reimbursements pursuant to the provisions of this section shall be approved by the court prior to payment.

D. Contingent fees and contracts for recovery of property agreed upon and approved by courts or the ranking official representing the Secretary of the Interior in Oklahoma, who has supervision of any restricted Indian tribe in this state do not come within the provisions of the Oklahoma Guardianship and Conservatorship Act.

[31] In re Guardianship of Stanfield, 2012 OK 8, ¶22, 276 P.3d 989, 1000 ( "Paragraph 'C' [ 30 O.S. § 4-403] states that 'All compensation and reimbursements pursuant to the provisions of this section shall be approved by the court prior to payment.'").

[32] The original application of David concerning Foster's trust and filed in the District Court in No. PT-2011-51 is missing page number 5 of that document. O.R. at 159-160. The almost identical application concerning Daughtrey's trust filed in No. PT-2011-52 contains page number 5. O.R. at 232.

[33] Vol. 5 of the record on appeal, docket entry for March 15, 2012, in No. PT-2011-51: "David Berry appears in person and by attorneys Cliff Baker and Steve Wyer."

[34] Vol. 5 of the record on appeal, docket entry for March 15, 2012, in No. PT-2011-52: "David Berry appears in person and by attorneys Cliff Baker and Steve Wyer."

[35] Brief in Support of Application to Assume Original Jurisdiction and Petition for Writ of Mandamus, No. 111,492, pp. 13-14, filed by both nominated counsel and counsel for the Berryhills.

[36] In re Guardianship of Holly, 2007 OK 53, ¶ 19, 164 P.3d at 143.

[37] Rules of Professional Conduct, 5 O.S.2011 Ch. 1, App. 3-A, Rule 1.7(b)(3).

Conflict of interest: current clients

(a) Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:
(1) the representation of one client will be directly adverse to another client; or
(2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.

(b) Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if:
(1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;
(2) the representation is not prohibited by law;
(3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and

(4) each affected client gives informed consent, confirmed in writing.

[38] July 11, 2012, Tr. at 5, line 16.

[39] August 17, 2012, Tr. at 31, & Berryhill Exhibit 1.

[40] Appellant's Brief in Chief, No. 111,492, filed April 15, 2013, at 22.

[41] Ex parte Spurrier, 1925 OK 506, 238 P. 956, 960, quoting Kersey v. McDougal, 1920 OK 623, 191 P. 594 (Syllabus by the Court) ( "A guardian appointed by a court has power over the person and property of the ward unless otherwise ordered, and such power is suspended only by order of the Court, . . . .").

[42] Appellant's Brief in Chief, No. 111,492, April 15, 2013, at 24-25.

[43] We characterize the evaluation as independent because the record before us contains no procedurally proper trial court challenge to the independence or merits of the evaluation that was pressed for adjudication in that court. Parties must raise their claims in the trial court within a proper procedural context for their adjudication before that court prior to pressing them in this court in the context of a review of the trial court's order adjudicating those claims, whether by appeal or a supervisory writ proceeding.

This Court does not issue advisory opinions or answer hypothetical questions, and we do not make first-instance assessments applying legal principles to facts, but allow the parties to develop issues of fact and law in the District Court. Scott v. Peterson, 2005 OK 84, ¶ 27, 126 P.3d 1232, 1239-1240.

[44] We note that the issue whether a person performing a mental evaluation on another may have a conflict if that person is also selected to care for that person solely on the basis of that assessment is an issue that is not before us.

[45] Scott v. Peterson, 2005 OK 84, ¶ 27, 126 P.3d at 1239-1240. We also note that David and the Berryhills raise a complaint concerning a guardian's report that is adjudicated in the companion proceeding herein, Okla. Sup. Ct. No. 112,573.

[46] One New York court has noted that a "cottage industry" has grown up around the need for professional care supervision for older persons, especially persons with mental and physical disabilities and that many social workers and other health care professionals have been certified as geriatric care managers through a professional organization, the National Association of Professional Geriatric Care Managers. In re Mark C.H., 28 Misc.3d 765, 767, 906 N.Y.S.2d 419, 421 (N.Y.Sur. 2010). According to one group of authors, GCMs [Geriatric Care Managers] who are admitted to full (advanced) membership in the National Association of Professional Geriatric Care Managers have master's degrees in social work, nursing, human services, or gerontology. Lisa Stewart, et al., The Interdisciplinary Team Focus: A Strategy for Developing a Successful Practice of Elder Law, 19 Nova L.Rev. 647, 653 (1995).

[47] In materials filed in No. 111,961 by the Berryhills: The partial deposition of S. Buchanan, a healthcare worker in the Berrys' home, contained no testimony on any directive concerning phone calls from the Berryhills. The partial deposition by R. Hall, also a healthcare worker, stated that a nurse calls the healthcare workers to let them know that a visit has been scheduled, but contains no discussion about monitoring phone calls from the Berryhills.

[48] See, e.g., Heffron v. District Court Oklahoma County, 2003 OK 75, ¶ 3, 77 P.3d 1069, 1073 ("... before appropriate relief may be granted, it must be shown that the trial court exceeded its authority or discretion in ordering or denying pretrial discovery.").

[49] The order appointing guardian states that "By agreement of the parties and their counsel, Christopher I. Mansfield is appointed General Guardian of the Person and Estate of the Wards." O.R. at 148.

[50] See 1. Petition to Remove Guardian and for Appointment of Successor Co-Guardians, filed by James and Anita Berryhill, July 9, 2012 (O.R. at 354); 2. Amended Petition to Remove Guardian and For Appointment of Successor Co-Guardians, filed by James and Anita Berryhill, Jul 11, 2012 (O.R. at 371); 3. Answer to Amended Petition to Remove Guardian and For Appointment of Successor Co-Guardians and Alternative Cross-Claim for Appointment as General Guardian, filed by Peggy Jan Harris July 30, 2012 (O.R. at 381); 4. Reply to Answer to Amended Petition to Remove Guardian and for Appointment of Successor Co-Guardians and Answer to Alternative Cross-Claim for Appointment as General Guardian, filed by James and Anita Berryhill on August 17, 2012 (O.R. at 419).

[51] Brief in Support of Application to Assume, etc., filed February 19, 2013, and "Appellant's [sic] Brief in Chief, April 15, 2013.

[52] Brief in Support of Emergency Application to Assume Original Jurisdiction, July 9, 2013.

[53] Appellant's Brief in Chief, No. 111,492, filed April 15, 2013, at p. 30.

[54] This argument is not well developed by the Berryhills and nominated counsel and the argument contains no authority. Appellant's Brief in Chief, No. 111,492, April 15, 2013, at 24-25. They claim that someone who performs an evaluation on another should not profit from that evaluation, and that Boyd and her company should not be selected to provide care to the Berrys since Boyd performed an initial evaluation. As we have previously observed, Dr. Bianco did not base his opinion of the Berrys on the preliminary evaluation performed by Boyd, and the record before us does not show how Boyd has a conflicting interest now that the Berrys have received an independent evaluation. We do not find an abuse of discretion on the part of the trial judge in declining to remove Boyd after Dr. Bianco's examination.

[55] Appellant's reply brief in No. 111,492, filed May 17, 2013, at 8-12.

[56] The application to assume original jurisdiction and petition for writs of mandamus and prohibition were filed in No. 111, 492, in this Court on February 19, 2013.

[57] Lebus v. Carden, 1978 OK 91, 583 P.2d 503.

[58] At the request of any party to a proceeding pursuant to the provisions of the Oklahoma Guardianship and Conservatorship Act, the court shall order that a stenographic or mechanical record of the proceeding be made. 30 O.S.2011 § 3-106 (G). It appears that no counsel requested a stenographic or mechanical record of the proceeding be made.

[59] State ex rel. Bd. of Regents of University of Oklahoma v. Lucas, 2013 OK 14, ¶ 44, 297 P.3d 378, 397.

[60] Brief filed in No. 112,573, February 14, 2014, in support of assuming jurisdiction by the Berryhills and David Berry, at 1.

[61] Russell, 2009 OK 22, ¶¶ 21, 24, 212 P.3d at 1185, 1186.

[62] Russell, 2009 OK 22, ¶¶ 14, 16, 212 P.3d at 1183.

[63] Russell, 2009 OK 22, ¶ 17, 212 P.3d at 1184.

[64] Chandler U.S.A., Inc. v. Tyree, 2004 OK 16, ¶ 33, 87 P.3d 598, 606.

[65] This Court has commented in various contexts on the important opportunity to engage in discovery so that a party may present a developed factual record to the trier of fact. State ex rel. Oklahoma Bar Ass'n v. Mothershed, 2011 OK 84, ¶ 58, 264 P.3d 1197, 1219.

[66] 30 O.S.2011 § 3-110 states in part:

The court shall cause notice to be served of the time and place of the hearing on the petition requesting the appointment of a guardian for an incapacitated or partially incapacitated person on:

1. the subject of the proceeding; and

2. the following persons, other than the petitioner, who are known to the petitioner or whose existence and address can be ascertained by the petitioner with reasonably diligent efforts:

a. the spouse, if any, of the subject of the proceeding,
b. the attorney, if any, of the subject of the proceeding,
c. all adult children of the subject of the proceeding,
d. if there is no such adult child, the then living parent or parents of the subject of the proceeding, or
e. if there is no such parent, all adult brothers and sisters of the subject of the proceeding and all adult grandchildren of the subject of the proceeding;

3. in case no person listed in paragraph 2 of this subsection is given notice, notice shall be given to at least one and not more than three of the nearest adult relatives of the subject of the proceeding who are known to the petitioner or whose existence and address can be ascertained with reasonably diligent efforts;

4. if not the petitioner, any person or organization which, in the petition, is proposed to serve as guardian or limited guardian or, to the extent such nomination is known to the petitioner, who is nominated by will or other writing to serve as guardian or limited guardian;

5. to the extent known to the petitioner:

a. the person or facility having care or custody of the subject of the proceeding, and
b. the Department of Human Services or the Department of Mental Health and Substance Abuse Services, if said Departments are providing services to the subject of the proceeding;

6. as appropriate, the Veterans Administration pursuant to Section 126.8 of Title 72 of the Oklahoma Statutes; and

7. any other person as directed by the court.

[67] 30 O.S.2011 § 4-307 states in part:

A. 1. Upon the filing of an annual report the court shall immediately cause a copy of the report to be mailed by first-class mail to:

a. the persons entitled to notice pursuant to Section 2-101 of this title for minors, or
b. those persons entitled to notice pursuant to paragraphs 1, 2, 3 and 7 of subsection A of Section 3-110 of this title for adults, and
c. the attorney of the ward, if any.

2. Attached to the copy of the report shall be a statement notifying the person receiving copies of said reports that any objection to the report must be filed within fifteen (15) days after the date of the filing of the annual report with the court.

3. Any person entitled to receive a copy of the annual report may file an objection to said report within fifteen (15) days after the filing of the annual report with the court.

[68] See, e.g., Crest Infiniti, II, LP v. Swinton, 2007 OK 77, ¶ 16, 174 P.3d 996, 1004 ("The party or person from whom a deposition is sought may, with good cause to be shown, request a protective order to 'protect a party or person from annoyance, harassment, embarrassment, oppression or undue delay, burden or expense....'"); Hall v. Goodwin, 1989 OK 88, n. 7, 775 P.2d 291, 295 ("The party objecting to discovery must raise the objection and has the burden of establishing the existence of the privilege."). We need not explain herein the basic procedures for a person or party seeking protection from discovery.






 Citationizer© Summary of Documents Citing This Document
Cite
 Name
 Level
 None Found.
Citationizer: Table of Authority
Cite
 Name
 Level
 Oklahoma Supreme Court Cases Cite
Name
Level 1989 OK 88, 775 P.2d 291, 69 OBJ 1473, Hall v. Goodwin
Discussed 1992 OK 95, 836 P.2d 1283, 63 OBJ 1926, Whig Syndicate, Inc. v. Keyes
Discussed 1993 OK 65, 852 P.2d 717, 64 OBJ 1497, Wilson v. Kane
Discussed 1938 OK 424, 81 P.2d 488, 183 Okla. 274, STATE ex rel. REIRDON v. COUNTY COURT OF MARSHALL COUNTY
Discussed 1994 OK 127, 885 P.2d 1358, 65 OBJ 3835, Chronic Pain Associates, Inc. v. Bubenik
Discussed 2001 OK 117, 42 P.3d 863, 72 OBJ 3708, DANIEL v. DANIEL
Discussed 1920 OK 263, 191 P. 594, 79 Okla. 53, KERSEY Guardian v. McDOUGAL.
Cited 1931 OK 244, 299 P. 143, 149 Okla. 54, HARRISON v. ORWIG
Discussed 2002 OK 67, 58 P.3d 759, CONTEREZ v. O'DONNELL
Discussed at Length 2003 OK 75, 77 P.3d 1069, HEFFRON v. DISTRICT COURT OF OKLAHOMA COUNTY
Discussed 2004 OK 16, 87 P.3d 598, CHANDLER (U.S.A.), INC. v. TYREE
Discussed 1996 OK 10, 912 P.2d 836, 67 OBJ 382, Liberty Bank and Trust Co. of Oklahoma City, N.A. v. Rogalin
Discussed 2005 OK 84, 126 P.3d 1232, SCOTT v. PETERSON
Discussed at Length 2006 OK 15, 131 P.3d 116, STATE v. ONE THOUSAND TWO HUNDRED SIXTY-SEVEN DOLLARS
Discussed at Length 1996 OK 73, 918 P.2d 1388, 67 OBJ 2060, LCR, Inc. v. Linwood Properties
Discussed 2007 OK 53, 164 P.3d 137, IN THE MATTER OF THE GUARDIANSHIP OF HOLLY
Discussed at Length 2007 OK 77, 174 P.3d 996, CREST INFINITI II, LP v. SWINTON
Discussed 2009 OK 22, 212 P.3d 1178, RUSSELL v. CHASE INVESTMENT SERVICES CORP.
Discussed at Length 2011 OK 84, 264 P.3d 1197, STATE ex rel. OKLAHOMA BAR ASSOCIATION v. MOTHERSHED
Discussed 2012 OK 8, 276 P.3d 989, IN THE MATTER OF THE GUARDIANSHIP OF STANFIELD
Discussed at Length 2013 OK 14, 297 P.3d 378, STATE ex rel. BOARD OF REGENTS OF THE UNIVERSITY OF OKLAHOMA v. LUCAS
Discussed 2013 OK 20, 299 P.3d 477, MIAMI BUSINESS SERVICES, LLC v. DAVIS
Discussed at Length 1978 OK 91, 583 P.2d 503, LEBUS v. CARDEN
Discussed 1928 OK 321, 267 P. 268, 130 Okla. 286, STEIL v. MARSHALL
Cited 2000 OK 30, 3 P.3d 154, 71 OBJ 960, Towne v. Hubbard
Discussed at Length 1925 OK 506, 238 P. 956, 111 Okla. 242, Ex parte SPURRIER
Discussed 1926 OK 3, 250 P. 999, 122 Okla. 110, REYNOLDS v. BROCK
Discussed 1998 OK 127, 975 P.2d 889, 70 OBJ 34, Martin v. Johnson
Discussed 1999 OK 10, 977 P.2d 1084, 70 OBJ 592, Towne v. Hubbard
Discussed at Length
Title 12. Civil Procedure Cite
Name
Level 12 O.S. 696.2, Judgment, Decree or Appealable Order to be Written - Preparation of Written Documents - Filing - Mailing - Effect
Discussed 12 O.S. 952, Jurisdiction of Supreme Court
Discussed at Length 12 O.S. 953, Final Order Defined
Cited 12 O.S. 990A, Appeal to Supreme Court of Oklahoma - Filing of Petition - Rules - Procedure - Dismissal
Discussed at Length 12 O.S. 993, Appeals from Certain Interlocutory Orders - Undertaking
Cited
Title 25. Definitions and General Provisions Cite
Name
Level 25 O.S. 82.1, Holidays
Discussed
Title 30. Guardian and Ward Cite
Name
Level 30 O.S. 1-111, Definitions
Cited 30 O.S. 3-106, Rights of Incapacitated or Partially Incapacitated Person - Confidentiality - Relief from Costs and Fees - Record
Discussed at Length 30 O.S. 3-107, Appointment of Attorney and Guardian Ad Litem - Explanation and Inquiry by Court if Subject not Represented - Record
Cited 30 O.S. 3-110, Notice of Hearing on Petition Requesting Appointment of Guardian for Incapacitated or Partially Incapacitated Person
Cited 30 O.S. 4-303, Account Settlement and Allowance - Reports - Consolidation of Reports - Accounting Information
Cited 30 O.S. 4-306, Contents of Report on Guardianship or Limited Guardianship of Property of Ward
Discussed 30 O.S. 4-307, Mailing of Copies of Annual Report Upon Filing - Hearing - Report Without Notice - Compensation - New Bond - Appointment of Counsel to Represent Ward
Cited 30 O.S. 4-403, Attorney Fees
Discussed at Length
Title 58. Probate Procedure Cite
Name
Level 58 O.S. 1, Probate Jurisdiction of District Court
Discussed 58 O.S. 721, Appealable Judgments and Orders of District Court
Discussed at Length